Cora OWENS, Plaintiff,

v.

CONTICARRIERS & TERMINALS, INC., Defendant.

No. 82–2488 H.

United States District Court, W.D. Tennessee, W.D.

Feb. 22, 1984.

Arnold B. Goldin, Goldin & Bloomfield, P.A., Memphis, Tenn., for plaintiff.

Carroll C. Johnson, Johnson & Bateman, Memphis, Tenn., for defendant.

## OPINION

HORTON, District Judge.

Plaintiff brings this action seeking to recover (1) under the Jones Act, 46 U.S.C. § 688, for injuries allegedly resulting from defendant's negligence; and (2) under general maritime law seeking to recover maintenance and cure. The case was tried by the Court sitting without a jury; and after full consideration of all the issues, the Court finds that judgment should be entered for the plaintiff.

## I. THE PARTIES

Plaintiff Cora Owens, a United States citizen and resident of Memphis, Tennessee, was employed as a seaman (cook) by defendant Conticarriers and Terminals, Inc. (Conticarriers) during the time period at issue. Defendant Conticarriers is a foreign corporation doing business in the State of Tennessee and engaged in interstate commerce. Defendant Conticarriers owns and operates a fleet of vessels and operates as a common and contract carrier on the Mississippi River. Defendant Conticarriers owns and operates the vessel the M/V Conti-Nan; plaintiff Owens was a crew member of the M/V Conti-Nan during the time relevant to this action.

## II. TESTIMONY

*Cora Owens*, age 61, Memphis, Tennessee, testified she was employed by Conticarriers on November 8, 1980, as a cook. She said she was feeling fine when she boarded the M/V Conti-Nan on Sunday, January 3, 1982, to begin her regular thirty day shift. She had been home thirty (30) days and had not been ill. She said that on January 6, 1982, she started feeling funny. She said she told Captain Young she was "real sick." She said Captain Young responded "you'll have to look sicker than that before I'll believe it." She said she told Captain Young that she needed off the boat because she was sick. He said, according to Mrs. Young, "you don't look sick to me." He told her she was not getting off until he got off. Mrs. Owens said that although she was sick, she did her regular

work on January 7, 1982, and other crew members told her if they were she they would stay in their room. Mrs. Owens said she spoke to Captain Young about her illness again on January 8th and 9th. During these talks she said he told her that he could get her off the boat but there was no bus or taxi. When she asked him how would she get off, he did not offer to make any arrangements to get her off. She said she continued her duties as best she could. She testified she suffered hurting through her chest and arms and she felt like she was going to die. Mrs. Owens was permitted to leave the boat when there was a crew change at Kampsville, Illinois, near St. Louis, on January 12, 1982; Captain Young also got off the boat at that crew change. She and Captain Young drove to the St. Louis airport and, the Memphis flight being grounded, she arrived in Memphis, Tennessee, the morning of January 13, 1982.

Mrs. Owens said she went to see her physician that same day, January 13, 1982, and after examining her, he admitted her to the Methodist Hospital, Memphis, on January 13, 1982. She said she suffered breathing difficulty and hurt all over. She remained in Methodist Hospital twenty-three (23) days, and was discharged on February 4, 1982. Her condition was diagnosed as bilateral pneumonia.

Mrs. Owens testified she did not call Conticarriers' office and report her illness while she was in St. Louis on January 12, 1982, because she was too sick. She testified that, on January 28, 1982, while she was in the hospital, she called Conticarriers' East Cardonelet, Illinois, office and talked with Susan, a secretary there. Mrs. Owens said she told Susan she was sick and in the hospital and asked Susan if she would receive any benefits while she was sick and unable to work. Mrs. Owens said Susan told her that only captains received money when they were off work because of illness.

Mrs. Owens testified she did not receive any payments from Conticarriers during

the period of her illness. She said she did not receive either maintenance or cure payments.

Mrs. Owens testified that after she was discharged from the hospital she again called Susan at Conticarriers' East Carondelet office and Susan asked Mrs. Owens when Mrs. Owens could return to work. Also, some time before March 3, Mrs. Owens said she talked with Port Captain David Willoughby about returning to work or being paid for her time off.

On March 3, 1982, Mrs. Owens returned to work and worked thirty (30) days. Thereafter, she was off thirty (30) days. When she reported for work on May 2, 1982, Captain Carl Talbert, a captain on the M/V Conti-Nan, sent a crew member to tell Mrs. Owens to come to the wheelhouse. When she went to the wheelhouse and spoke to Captain Talbert, he said, "Don't be speaking to me because you're fired. You have been telling people I was drinking." When she denied the accusation, Captain Talbert said she was fired anyway for unsatisfactory work. Mrs. Owens said she applied for and received unemployment compensation for twenty-six (26) weeks. Since that time, she has called several boat companies and written two letters but has been unable to obtain employment with any other boat company.

On cross-examination, Mrs. Owens said that before going on the boat January 3, 1982, her health was good and she had no health problems. She stated she is now in "pretty good health" but cannot "breathe good."

She said as a cook she worked on the boat thirty (30) days and then received thirty (30) days off. Mrs. Owens said she was paid $43.12 for every day she worked on the boat, and for every day she worked she was paid for that day and one additional day. She termed such a payroll plan "day for day."

Mrs. Owens said that when she left the boat on January 12, 1982, she told Captain Young she thought she had pneumonia and he should notify the company. Captain Young, she said, told her not to worry about his problems, that she should take care of her problems.

Mrs. Owens admitted she had seen Captain Talbert drinking and told him she was going to report him, but said she did not report him.

*Captain Raymond Young* testified that he is employed by Conticarriers and Terminals, Inc., as a captain. He was a pilot on motor vessels navigating the inland waterways for nine (9) years and has been a boat captain for seven (7) years. He holds a U.S. Coast Guard approved Operator's License. He was serving as the captain of the M/V Conti-Nan in January, 1982. Plaintiff Owens was a member of his crew on the boat. He said Mrs. Owens was a full time cook and worked a shift of thirty (30) days on and thirty (30) days off.

Captain Young said Mrs. Owens boarded the M/V Conti-Nan on January 3, 1982, in the area of Alton, Illinois. The boat traveled south from Alton, Illinois, to a point near St. Louis, where tows were picked up. The boat left the Mississippi River and entered the Illinois River on January 6, 1982. The Illinois River was frozen over, but there was an open trail for traffic. The boat went north to a point near Kingston, Illinois, where it dropped a tow and picked up a south bound tow. Between January 6th and 7th, 1982, the boat traveled north a distance of 147 river miles.

Captain Young testified from January 3rd to 7th, 1982, Mrs. Owens said nothing about being sick.

Captain Young testified that on January 8, 1982, when the boat was south bound on the Illinois River, Mrs. Owens reported to him that she was sick. This was his first knowledge of her being ill. He said Mrs. Owens said she was sick, that she had a cold. He said he asked her if she wanted to get off the boat. If she did, he would call the Conticarriers office and arrange to get her off.

He said he told her there would be a crew change in St. Louis. He then called his office and reported that he would need a replacement for her at St. Louis. He said

he talked with Mrs. Owens in the boat's galley. Captain Young testified Mrs. Owens decided not to get off the boat then but to wait and get off when the crew changed in St. Louis. He said he told her she could go to her room and rest. Captain Young testified that if Mrs. Owens had gone to her bunk to rest, the crew members could have made sandwiches for themselves.

On direct examination, Captain Young said Mrs. Owens told him she wanted to get off because she was ill. When he offered to make arrangements to get her off, she decided she did not want to get off. She continued her duties as cook and he did not provide anyone to help her with her duties. Captain Young said he did not require her to leave the boat. He did not consider it his responsibility to put her off the boat if she did not want to get off. He said there was a crew change between 11:00 a.m. and noon at Kampsville, Illinois, near St. Louis, on January 12, 1982. He said that he and Mrs. Owens, and two others drove to the St. Louis airport and boarded a plane for Memphis, Tennessee, early that evening.

Captain Young testified that during the boat trip and during the drive to the St. Louis airport, Mrs. Owens "seemed normal" to him. He testified she did not appear ill.

Captain Young said all final decisions are made by the captain of the boat and no crew member can question any final decision of the captain. He said he did not file a report with his company about Mrs. Owens' illness and did not make any entry about it in his daily log. He did say that when she first reported her illness she told him "she was so ill she wanted to get off of the boat." He also said that when Mrs. Owens boarded the boat on January 3, 1982, she told him she had been sick with a cold during her off days. At that time he asked her if she were OK and she answered that she was OK.

*Captain David Willoughby* was port captain for Conticarriers during 1981 and 1982 and is still employed by Conticarriers. Captain Willoughby testified that, as port captain, he was responsible for crews, supplies and problems relating to the operation of his company's boats. As port captain, he exercised a supervisory power over boat captains. His office was located at East Carondelet, Illinois. Captain Willoughby said Captain Carl Talbert is now on long term disability and lives at Grafton, Illinois.

Captain Willoughby said Captain Young requested a relief cook for Mrs. Owens about the 9th or 10th of January, 1982; the relief cook was to take over at the January 12th crew change, as Mrs. Owens was sick. Captain Willoughby said he asked Captain Young if Mrs. Owens needed to get off then and Captain Young decided to wait until the crew change.

Captain Willoughby said he was on the plane with Captain Young and Mrs. Owens on the flight to Memphis. He said they arrived in Memphis about 3 o'clock on the afternoon of January 12, 1982. He said Mrs. Owens told him she was sick and had a cold or the flu. He did not discuss her illness any further. Captain Willoughby said that from January 12, 1982, until March 3, 1982, he did not see or talk with Mrs. Owens, but he knew that during this period Mrs. Owens had talked with Susan, the secretary in his office. He did talk with Mrs. Owens sometime between April 1 and May 1, 1982, because she had reported drinking by Captain Talbert and Conti-Nan crew members in Dubuque, Iowa. Mrs. Owens had reported this to Captain Willoughby because he was port captain. Captain Willoughby said he investigated Mrs. Owens' call and determined no drinking was involved. Captain Willoughby stated that Captain Talbert knew about the investigation and knew that Mrs. Owens had made the accusation. Captain Willoughby testified he learned on May 3, 1982, that Mrs. Owens had been terminated. He said boat captains have the right to hire and fire anyone on that boat, and Conticarriers will not question the captain's decisions but will back him up. Conticarriers' policy is that the captain is in charge and is responsible for the crew on that boat.

Captain Willoughby stated that since May or June, 1982, the river business has been slow and jobs are very scarce.

Captain Willoughby testified that when a crew member becomes ill, the captain should get that person off the boat as soon as possible, depending on the nature of the illness. While Conticarriers has no written procedure on the subject, the company's policy is to provide medical care as soon as possible. If an illness is serious enough, the captain can act on his own to arrange for medical care. If he needs help, it can be obtained from the port captain. Captain Willoughby said his company did, on one occasion, get Mrs. Owens off a boat at Louisville, Kentucky, because of illness. He said that if a person approaches a captain and says he is ill and needs to get off the boat, that is enough to justify getting the person off, and the captain has a duty to get the person off. He said there are hospitals along the route the Conti-Nan traveled on this occasion. Captain Willoughby also testified that every Conticarriers' vessel has on board a book showing the name, location and phone numbers of hospitals located near the rivers. He did say, however, that he would not require a person to leave a boat if the person said he did not want to get off. "We don't," he said, "force them off."

*Captain Charles W. Edwards,* a marine consultant and marine investigator, Memphis, Tennessee, testified as an expert witness for plaintiff Owens. Captain Edwards testified that he holds a Master's License and a First Class Pilot's License. He was a master more than twenty (20) years and a senior master for seventeen (17) of those years. He was previously employed by the Exxon Corporation and has worked for other river boat companies.

Captain Edwards testified that the captain of a boat is responsible for the safety of the vessel and the crew. He is responsible for the well-being and safety of his crew. He is in charge of that vessel and has the last word on that vessel. The captain is in complete authority; his responsibility is to see to the best of his ability that the health of his crew is cared for. Captain Edwards testified that if a captain is told by a crew member that the crew member is ill, the captain's duty is to make arrangements to get medical care as soon as possible. This requires, he said, not only putting the sick crew member off the boat, but sending someone with him to provide assistance. Via communications equipment on the boat, the captain can immediately consult his office for advice. Some attempt should be made to have an ill person cared for.

Captain Edwards said, in his opinion, it is highly unusual for a company not to have some written procedure to guide the captain as to how illness should be handled. Captain Edwards stated there ought to be some standard operating procedure for handling illness on board the boat. He said he has participated in writing such procedures and in practice sessions so that captains would know how to handle matters of illness and injury on the boats. Captain Edwards also said it is customary in the river traffic industry for a captain to make log entries when illness is reported to him.

On cross-examination, Captain Edwards, said if a crew member is ill and needs medical attention, then that care and attention should be provided as soon as practicable. If the boat is between towns, it may take several hours to get to the next town. If a crew member refuses medical attention, then the captain should contact his office for guidance. He again said it was highly unusual for the captain of the Conti-Nan not to have made a log entry on Mrs. Owens' reported illness.

Captain Edwards said the master of a boat has a little different responsibility. He said people on a boat are isolated when on the river and the captain has to take these things seriously.

*Jeffrey Powell,* Insurance and Claims Manager for Conticarriers and Terminals, testified that Continental Grain Company is the parent company of Conticarriers. Their insurance underwriter is the Equitable Life Assurance Society. Mr. Powell said his first notice of Mrs. Owens' claim

was when this Jones Act lawsuit was filed. He said the group insurance health policy pays what Equitable determines to be a fair and reasonable hospital room rate. Any charge in excess of that rate is paid by the employee. The policy has a $100 deductible and the company pays the premiums. This group insurance is available to employees after a ninety (90) day waiting period. It is a major medical and health policy. He said this insurance covers the employee while away from work. Other maritime insurance covers Jones Act illness or injury at work.

Mr. Powell said the normal way the company learns about an employee's illness or injury suffered while on board is from the captain's boat log. He said Captain Young did not report Mrs. Owens' illness to the insurance office or to the port captain's office.

If Mrs. Owens' illness was a work related illness, then health benefits should have been paid by Conticarriers' marine liability coverage, not the Equitable group health insurance. Mr. Powell said there are two categories of payment under the marine liability (Jones Act) coverage: (1) payment of medical bills (the cure portion), and (2) maintenance. Mr. Powell said no maintenance has been paid to Mrs. Owens. Equitable, not Conticarriers, paid most of Mrs. Owens' medical bills. Mr. Powell said Conticarriers is self-insured for the first $25,000 of liability under its marine liability (Jones Act) insurance coverage.

Mr. Powell said Mrs. Owens was regularly paid $43.12 per day. For each day she worked, Mrs. Owens accumulated a day of accumulated time off, for which she would also be paid $43.12.

Mr. Powell said his company employs a *needs* test to determine the maintenance rate. Conticarriers pays, for maintenance, a minimum of $12.00 per day and a maximum of 75% of the employee's daily rate of pay.

*Dr. Ronald Terhune,* a physician board certified in family practice, testified via deposition. Dr. Terhune stated he had been Mrs. Owens' physician since 1968 and had previously treated her for bronchitis and upper respiratory infections. Dr. Terhune testified that Mrs. Owens came to his office on January 13, 1982, complaining of headache, cough and difficulty breathing. He performed a physical examination and the "main physical findings were wheezes in both sides of her chest with some rales, and she had a chest X-ray at this time, which revealed a bronchial type pneumonia with an infiltrate in the left lung field." Dr. Terhune testified he had Mrs. Owens go from his office to Methodist Hospital North, where she was admitted. In his deposition, Dr. Terhune described the treatment Mrs. Owens received while hospitalized, as chronicled in her discharge summary:

A  This says this 58-year-old white female was admitted to the hospital with chief complaint of pneumonia. Her admission laboratory studies revealed a chest X-ray with bilateral pneumonia with infiltration in both bases. That means that she had pneumonia in both lungs when we got to the hospital.

She had a CBC, which is a complete blood count, showing an elevation of her white count to 11,500 with 70% segs. That reflects the blood reflected infection in her lung of a bacterial type.

Q  Is that a fairly high count?

A  Not for as sick as she was. It was surprising it wasn't higher. You would expect it more normally to be up anywhere 15 to 20 thousand, as ill as she was, but in her case, what will happen, sometimes, when you get an acute infection, your count will shoot up, and then it stays on three or four days, your body sort of equilibrates to it, and the count will drop, and I think that's what happened to her.

She had a normal red count, which means she wasn't anemic. Her SMA, which is a battery of tests that we do on any adult that goes in the hospital, which checks for diabetes and liver and kidney function, was normal, with the exception of an elevation of her alkaline phosphatese to 194 and of

an LDH of 250, which I thought was secondary to lung engorgement. When the lungs become inflamed, they will give off these enzymes, one of which is LDH and one of which is alkaline phosphatese, and I thought that was the reason for that.

She was initially placed on Keflin one gram I.V. every six hours, which is a broad spectrum penicillin derivative antibiotic that's quite strong.

An EKG was done, or electrocardiogram, which was within normal limits, and this is routine on people that are over 40 or have any kind of serious medical illness.

She was given intermittent positive pressure, which is a type of breathing treatment that will force—force air and solutions into your lungs to open up the lungs and help stop the wheezing, and we added to that 40% oxygen with saline and Isuprel. Isuprel is a bronchial dilator, which helps relieve wheezing.

She was also given Lufyllin EPG two teaspoons four times a day, which are—which is likewise a bronchial dilator expectorant. She was given Dalmane, for pain, and—well, Dalmane is actually for rest. It's not for pain. That's a mistake. She was given Darvocet for pain because she had a pleuritic component to her illness, which means she was having—when she took a deep breath, she was having a lancinating chest-type pain secondary to a pneumonia, and that's what the Darvocet was for.

She was afebrile on admission, and remained so during her hospitalization, which is somewhat surprising. Usually, you would have a higher temperature, but sometimes in people with either chronic lung disease or an illness that has gone on for several days, the febrile component would be past by the time you get in, and hers was.

Her repeat chest X-ray looked better than in the office, but she was still very symptomatic with wheezing. Her I.V. infiltrated on $1/16$, and the Keflin was discontinued. Vibratabs was given, 100 milligrams twice a day, and—which is another antibiotic, and Brethine, which is another antibiotic, and Breathine $2\frac{1}{2}$ milligrams four times a day was added, which is a bronchodilator to make the wheezing stop, and Phenergan expectorant plain two teaspoons four times a day, which is an expectorant as well.

She continued to have pain and wheezing. Arterial blood gases were done on $1/18$, and revealed a 59% saturation of her $PO_2$. Your normal $PO_2$ should be above 85%.

Q What does that indicate, Doctor?

A It indicates that she has a fairly severe generalized obstruction with her lungs, not allowing the oxygen flow to get into the blood like it should.

When you get down below 40%, you have to have oxygen in your nose to even survive, and a lung scan was done, with ventilation profusion component, to rule out a pulmonary embolus. You worry about her having a blood clot from her leg to some part of her body to her lungs, that could be making her not clear up like she should, although this was negative.

A PPD and histoplasmin skin tests were done. These were tests for tuberclosis and for histoplasmosis, infections you can get of a fungal nature, but they were done, and they were both negative. Her Lufyllin was increased to cne tablespoon four times a day in order to try to loosen up the secretions in her lungs, and the Brethine was increased to five milligrams four times a day.

At this point, she was seen in consultation by Dr. Hammond Cole, who is a thoracic surgeon, and a bronchoscopy was done.

This was done because she was not clearing like she normally should, and we wanted to rule out either tumor or mucous that would not clear from normal expectorants. It revealed no definite abnormalities, and he did what you would call a bronchial lavage, or, in essence, cleaned out the lungs.

She continued to have pleuritic chest pain. She was seen while I was out of town by Dr. Jerry Randolph, who was cov-

ering for me, and we changed to Polymox, which is a different antibiotic, 500 milligrams every six hours, and the Vibratabs was discontinued. Her theophylline level was done, which was not therapeutic, and so the Lufyllin EPG was changed to Bronchobid 300 milligrams twice a day, and this is just a different expectorant to try to get her level up to a therapeutic range.

Her Isuprel was changed to Bronchosol, ½ cc four times a day, which is another type of bronchodilator.

She began to gradually improve. Her theophylline came into therapeutic range. She was again seen by me on 1/25 after coming back into town. At this time she had a yeast overgrowth in her mouth, and Microstat oral swish was given, Basid capsules were given for three days. This is a complication you get from taking large, long doses of antibiotics where you get a fungal overgrowth in your mouth, and this should clear it up.

She was started on Azolid–A 100 milligrams three times a day with rapid improvement of her chest pain. This is an anti-inflammatory drug like you use for bursitis, tendinitis, arthritis and sometimes pleurisy, and in her case it was because of the pleurisy to relieve the pain. It's not a specific pain reliever. It relieves the inflammation, and in that sense relieves the pain.

Her arterial blood gases remain at a $PO_2$ in the 60% range, with 93% saturation, and what this tells us that even though the lungs are functioning at a 93% saturation of the blood, she can only get 60% of the oxygen she needs to have. And so it tells us that even though she is improved clinically, she has a significant obstructive lung disease. She was continued on positive pressure—I'm sorry—Azolid–A was discontinued on 1/28. She was started on Prednisone on 1/30 by Dr. Hammond Cole, with 40 milligrams initially decreasing the Prednisone to 30 milligrams for two days and then to 20 and then was discharged from the hospital, and was on 2/3/82, with the lungs totally clear, which

means you could hear no wheezing at this time.

The Prednisone is likewise an anti-inflammatory drug to relieve the allergen component in her lungs and the reactive component, and did it fairly well.

She was discharged on 10 milligrams each morning, given Serax 15 milligrams three times a day. Serax is a tranquilizer and somewhat of an anti-allergen drug. Bronchodil 200 one three times a day, which is a bronchodilator; Brethine five milligrams three times a day, which was likewise a bronchial dilator. She had a pulmonary function study that revealed a moderately severe obstructive lung disease with some improvement on bronchial dilatation. She was to be rechecked in my office in one week, and was to remain off work.

Dr. Terhune testified that Mrs. Owens was discharged from the hospital on February 3, 1982, and she returned to his office for follow up care of this illness on February 10, February 17, March 1, April 6, and June 7, 1982.

Regarding the onset of Mrs. Owens' illness, Dr. Terhune testified the medical history obtained by him from Mrs. Owens revealed "Mrs. Owens had been ill for approximately five days, and had been on the river, and had been unable to get off the boat prior to the time she came to see me." His office notes of this January 13, 1982 visit stated: "Been on river and in trouble five days, wheezes, anterior and posterior . . ."

Defendant's counsel questioned Dr. Terhune further about this:

Q   And so there's nothing in this note that I see about she—anything saying she had been unable to get off the boat, is it?

A   No. But I don't write everything a patient tells me. I could—And we discussed this. I discussed this with Ms. Owens on several occasions because I was on her about not getting in here in time to be checked.

Q   That's what I was going to ask you next. When did you discuss this with

Ms. Owens? Was that after she had retained counsel, or was that before?

A Oh, no. No. This was the day she came in. She had had enough trouble that Ms. Owens knew to get treatment when she started getting ill, and this was another thing we emphatically emphasized after she got out—as she was getting out of the hospital, even more so, because I knew to what extent she had trouble, and I knew before that if she waited too long, she was going to be in trouble, because of the number of times she had to be seen, and I can vividly remember her coming in as we talked about why she didn't get in sooner.

Q All right. And so now it's your recollection from your memory that on January 13, 1982, she told you that she was unable to get off the boat?

A She told me that she had—that the boat, she had difficulty getting off the boat. We didn't discuss why she had difficulty getting off the boat, but she had trouble getting off the boat.

Dr. Terhune testified Mrs. Owens "was seriously ill when I first saw her in the office" on January 13, 1982. Dr. Terhune was asked by plaintiff's counsel:

My question is, what did you mean by the statement, "visibly ill"?

A I think that she was ill enough that a person who is not—a normal, lay person could tell the woman was sick. I don't think it would take a medical doctor to tell you that.

Q You say it would not?

A It would not.

Q Let me ask you this, Doctor: What would be the typical gestation period for an illness such as this?

A Most pneumonias have an incubation period of anywhere from 36 to 48 hours. Some are less than that, but that's the average.

Q And when, in your opinion, to a reasonable degree of medical certainty in this particular case, would this illness have manifested itself in Ms. Owens?

A Ms. Owens said that she had felt subjectively ill enough to need to get off the boat for five days, and so I would presume that the illness started manifesting itself somewhere seven to eight days prior to her getting off the boat.

Q In your opinion, would that visible type illness have manifested itself during that five-day period?

MR. JOHNSON: I object to the form of that question.

Q Let me restate that, Doctor: For what period of time prior to her getting off the boat, I believe you said you saw her on the 13th, what period of time, prior to her getting off the boat, in your opinion, would she have been visibly or obviously ill?

A For at least 72 hours, I would think, at a minimum of 72 hours.

Q Would that be to any person?

A I would think so.

MR. JOHNSON: I object to the form of that question.

Q (By Mr. Goldin) For the purposes of protecting the record, Doctor, for what period of time, in your opinion, would this visible illness have manifested itself to any person?

A For approximately 72 hours.

Defendant's counsel also questioned Dr. Terhune about Mrs. Owens' outward appearance on January 13, 1982:

Q All right. Now, when this lady came into your office on January 13, 1982, you said it was obvious that she was ill, is that correct?

A Yes.

Q And I assume by that you meant, was her face flushed?

A Well, she was wheezing. She was using her accessory muscles and respiration, and you could see her wheezing. You could hear some wheezing, and whether her face was flushed, I don't know that. I think the main thing that impressed me was the shortness of breath. You could see she was visibly short of breath, like she was having an acute asthma attack.

Q  And you had seen her on previous occasions when she was wheezing and had shortness of breath, hadn't you?

A  Not to this extent.

Q  All right.  Now, were those her symptoms that you say made it obvious that she was sick, that made it obvious that she was wheezing?

A  And she looked ill, just like a patient will look ill, and sometimes they can look more ill than they really are.  I think in this case, she was as ill as she looked.

Q  What do you mean she looked ill?  Was she red in the face, or—Exactly what did she look like?

A  Just like asking how you tell a fake hundred-dollar bill from a real one.  You just develop a sixth sense when you deal with patients on a daily basis for the ones that are putting on and the ones that aren't.

Q  You mean as a doctor, you do that?

A  Yes.  Yes, I guess, and I don't know how to tell you that—how you can look at somebody and tell.  I think this woman looked ill enough that a lay person could have told she was sick.

Q  That's what I'm asking you about.  What did she exhibit, outward signs to a lay person?

A  Her outward signs was, like when somebody has a bad flu, they look ill, and they are piqued, and they are—she is struggling to breathe, and you can see her struggling to breathe, and she was.

Q  That's the point I wanted to make.  If the average person saw her, could he tell whether she had pneumonia, a bad cold, or the flu?

A  No.  You could tell that she was sick.  I don't think a doctor could tell you she had pneumonia, a bad cold or flu, by looking at her across the room, but you can tell that she is ill.

Dr. Terhune was asked:

BY MR. GOLDIN:

Q  Doctor, in this particular case, based on the history that was provided to you by Ms. Owens, what would be your opinion as to a reasonable degree of medical certainty as to the effect in this particular case of the failure to receive prompt medical treatment for this particular illness?

MR. JOHNSON: I object to it.

A  I think that in her case, that it made it much more difficult to clear her and cause the illness to be more serious.

## III.  MOTION TO REOPEN

The Court recognizes there is a conflict between the testimony of Mrs. Owens and that of Captain Young and Captain Willoughby regarding when the three of them returned to Memphis.  Mrs. Owens testified she and Captain Young left the M/V Conti-Nan around noon on January 12 and arrived at the St. Louis airport later that afternoon.  She emphatically testified the flight to Memphis was grounded, forcing her to spend the night in a St. Louis motel.  Mrs. Owens further testified she, Captain Young and Captain Willoughby traveled to Memphis, Tennessee, on the same commercial flight on the morning of January 13th.  Captains Young and Willoughby testified that they and Mrs. Owens took the same flight to Memphis late in the afternoon of January 12th; they vigorously deny that their flight was grounded or that they spent the night of January 12th in St. Louis.

Aside from the obvious credibility problem created by this conflict, the resolution of the conflict has another implication.  It is uncontradicted that Mrs. Owens saw her physician Dr. Terhune in Memphis on January 13th.  Via the testimony of Captains Young and Willoughby, the defendant apparently is trying to demonstrate the plaintiff did not attempt to obtain prompt medical care upon reaching Memphis.

In an effort to strengthen Captain Young and Captain Willoughby's version of when they and Mrs. Owens traveled from St. Louis to Memphis, defendant has filed a motion to reopen the proof.  Through the motion to reopen, defendant would have the Court admit evidence relating to the date on which the travel in question oc-

curred. The affidavit of Jeffrey Powell accompanies the motion to reopen and states that the documents attached to his affidavit "show that Cora Owens flew from St. Louis, Missouri, to Memphis, Tennessee, on January 12, 1982." Defendant had known far in advance of trial Mrs. Owens' testimony was that the January 12th flight was grounded and all three flew to Memphis on January 13th. But, in his affidavit Mr. Powell states he "did not realize until the evening of January 31, 1984, the day before the trial ... that two Conticarriers employees, David Willoughby and Raymond Young, had flown from St. Louis to Memphis on January 12, 1982, and not January 13, 1982 ... At that time it was to [sic] late to obtain these records from my office in Des Plaines, Illinois." Attached to Mr. Powell's affidavit are the expense vouchers of Owens, Young and Willoughby along with supporting documentation.

Plaintiff has filed a response objecting to defendant's motion to reopen. Plaintiff's counsel points out that in her November 11, 1982, deposition, Mrs. Owens testified that on January 12, 1982, she was unable to get a flight out of St. Louis because all planes were grounded, she spent the night of January 12 in St. Louis and she flew to Memphis the following morning. Plaintiff notes that the documentary evidence defendant now tenders has been in defendant's possession at all times since January, 1982. Further, Mr. Powell, Captain Young and Captain Willoughby are all employees of defendant and all testified at trial. Defendant could have examined either the documents or the employees any time prior to trial. Plaintiff contends that although the decision whether to reopen the case is in the Court's discretion, to reopen the case now would be unfair and prejudicial to Mrs. Owens.

▆▆▆ Whether to reopen a case to receive additional evidence is within the discretion of the trial court. *Calage v. University of Tennessee*, 544 F.2d 297, 301 (6th Cir.1976) (citing cases). The Court finds no circumstances such as would justify reopening the proof in this case. First, Mrs.

Owens, Captain Young and Captain Willoughby all testified at trial; all were questioned closely about their trip from St. Louis to Memphis and whether such trip occurred on January 12th or January 13th. Copies of the three airline tickets show the tickets were issued for Republic Flight 402 scheduled to leave St. Louis on January 12, at 1:35 p.m. Whether the flight departed St. Louis as scheduled cannot be ascertained from copies of the tickets or from any other documents submitted with Mr. Powell's affidavit. Mrs. Owens' Travel Expense Statement was completed and her name signed by someone other than Mrs. Owens, apparently by an employee in Conticarriers' office. Captain Young's Travel Expense Statement shows he and Mrs. Owens traveled in the same taxi from Alton, Illinois, to the St. Louis airport on January 12th, as testified by both of them. Captain Willoughby apparently rented an automobile in Memphis, but the copy of that rental receipt is largely illegible and no dates are decipherable. Fourth, even if the newly submitted evidence clearly established that the trip from St. Louis to Memphis occurred on the afternoon of January 12th, such evidence would have little impact on the outcome of the case since plaintiff has clearly established, through testimony of multiple witnesses, facts necessary to prevail on the issues. For these reasons the Court denies defendant's motion to reopen the case for admission of additional evidence.

## IV. JONES ACT ACTION

▆▆▆ 46 U.S.C. § 688 provides in pertinent part:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply.

"The Jones Act was adopted as remedial legislation designed to give a seaman the

same right to recovery against his employer as the Federal Employer's Liability Act ('FELA') gives to railroad employees." *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329 (5th Cir.1977) (citing *Ferguson v. Moore-McCormack Lines, Inc.*, 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957)). Under the Jones Act, evidence of "the slightest negligence" is sufficient to sustain a finding of Jones Act liability. *Davis v. Hill Engineering, Inc.*, 549 F.2d at 329 (citations omitted). A plaintiff's burden to prove proximate cause under the Jones Act is very light, even "featherweight." *Comeaux v. T.L. James & Co.*, 702 F.2d 1023, 1024 (5th Cir.1983); *Davis v. Hill Engineering, Inc.*, 549 F.2d at 331. *Accord Carlton v. M/G Transport Services, Inc.*, 698 F.2d 846 (6th Cir.1983). "[I]n Jones Act cases causation may be found if the defendant's acts or omissions played *any part, no matter how small*, in bringing about the injury." *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 685 (10th Cir. 1981) (emphasis added) (citing *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)). Negligent failure to provide prompt medical attention to an ill or injured seaman is a breach of duty constituting a violation of the Jones Act. *Joyce v. Atlantic Richfield Co.*, 651 F.2d at 685.

■ The Court finds Mrs. Owens has met her burden of establishing defendant's liability under the Jones Act. Uncontradicted testimony from both Mrs. Owens and Captain Young establishes that Mrs. Owens told Captain Young she was ill during her January, 1982, tour of duty aboard the M/V Conti-Nan. The court finds, based on all the evidence, that beginning on January 6, 1982, Mrs. Owens repeatedly requested to be put ashore so as to obtain medical care. The Court finds Captain Young refused to give serious consideration to Mrs. Owens' requests for medical care. Rather, Captain Young did not contact Conticarriers' office for advice nor did he undertake to arrange any transportation to take Mrs. Owens from the boat to a health care facility; he merely requested a relief cook be provided for the January 12th crew change.

In light of all the evidence and having observed the demeanor of the witnesses, the Court determines that once back in Memphis Mrs. Owens promptly sought medical care. Uncontradicted medical testimony established that Mrs. Owens was visibly, seriously ill when she saw Dr. Terhune on January 13th. Dr. Terhune testified Mrs. Owens' condition would have been obvious even to a layperson and that such condition would have been apparent for at least the prior 24 to 48 hours. Despite this, Captain Young testified that Mrs. Owens appeared no different than usual on January 12th. Captain Willoughby testified that on January 12th he was aware plaintiff "had a cold or the flu" but he did not ask her any questions about her condition. Once at the St. Louis airport neither Captain Young nor Captain Willoughby offered to assist Mrs. Owens in any way. The Court finds the attitude of Captains Young and Willoughby toward Mrs. Owens' illness was one of callous indifference. Although both were aware of her illness, the Court finds neither captain made a good faith effort to obtain medical care for Mrs. Owens. Rather, the Court finds Mrs. Owens was not provided a legitimate opportunity to leave the M/V Conti-Nan and seek medical care until the regularly scheduled crew change at Kampsville on January 12th.

Having listened to the testimony and observed the demeanor of the witnesses, the Court finds as a fact that the defendant Conticarriers breached its duty to provide Mrs. Owens prompt medical care for serious illness suffered while she was serving as a crew member on defendant's boat. The Court further finds defendant's refusal to take seriously Mrs. Owens' complaints of illness resulted in the aggravation of plaintiff's condition, exposed her to increase pain and suffering and greatly prolonged her recovery period.

For such injuries Mrs. Owens is entitled to recover tort damages. The Court finds

Mrs. Owens is entitled to compensatory damages of $25,000 for pain and suffering.

## V. MAINTENANCE AND CURE

■ Generally, shipowners must provide maintenance and cure to seamen who become ill in the service of the ship. *Vella v. Ford Motor Co.*, 421 U.S. 1, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975). The purpose of maintenance and cure is

> to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery. The policy underlying the duty was summarized in *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993:
>
> > "The reasons underlying the rule, to which reference must be made in defining it, are those enumerated in the classic passage by Mr. Justice Story in *Harden v. Gordon*, C.C., Fed.Cas.No. 6047: The protection of seamen, who, as a class, are poor, friendless and improvident, from the hazards of illness and abandonment while ill in foreign ports; the inducement to masters and owners to protect the safety and health of seamen while in service; the maintenance of a merchant marine for the commercial service and maritime defense of the nation by inducing men to accept employment in an arduous and perilous service."
>
> Admiralty courts have been liberal in interpreting this duty "for the benefit and protection of seamen who are its wards." Id., at 529, 58 S.Ct. at 654. We noted in *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730, 63 S.Ct. 930, 933, 934, 87 L.Ed. 1107, that the shipowner's liability for maintenance and cure was among "the most pervasive" of all and that it was not to be defeated by restrictive distinctions nor "narrowly confined." Id., at 735, 63 S.Ct. at 936. When there are ambiguities or doubts, they are resolved in favor of the seaman. *Warren*

*v. United States*, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503.

*Vaughan v. Atkinson*, 369 U.S. 527, 531–32, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88 (1962).

■ "Ordinarily, a seaman who seeks maintenance and cure need only prove that the injury or illness arose during his employment." *Liner v. J.B. Talley & Co.*, 618 F.2d 327, 332 (5th Cir.1980). The seaman need not prove any causal connection between his illness and his duties in order to be entitled to maintenance and cure; in fact, the seaman's entitlement to maintenance and cure is "entirely unrelated to any fault or negligence on the part of the shipowner." *Id.* (quoting *Oswalt v. Williamson Towing Co.*, 488 F.2d 51, 53 (5th Cir.1974)).

■ The Court finds Mrs. Owens has proved that she became ill while serving on defendant's vessel and therefore is entitled to maintenance and cure in the amount of $665.00. Mrs. Owens was released from the hospital on February 4, 1982, and returned to work on March 3, 1982; she is owed maintenance for this interval. Undisputed evidence at trial showed Mrs. Owens' living expenses during the period totaled $665.00. In awarding this amount of maintenance, the Court has considered the *needs* test employed by Conticarriers and has remained within the minimum and maximum monetary limits observed by defendant.

### A. Recovery of Attorney's Fees

■ "If the shipowner, in failing to provide maintenance and cure, has been callous and recalcitrant, or arbitrary or capricious, reasonable attorney's fees may also be recovered." *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 375 (5th Cir. 1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982), (citations omitted).

■ The Court finds that in failing to provide maintenance and cure for Mrs. Owens, Conticarriers was callous, arbitrary and capricious. Conticarriers' employees Captain Young and Captain Willoughby

knew Mrs. Owens had become ill during her January, 1982, tour of duty on the M/V Conti-Nan, but neither reported this to Mr. Powell or to other Conticarriers officials. Further, Mrs. Owens reported her illness to Conticarriers East Carondelet office, but defendant still made no effort to provide maintenance and cure. Even after Mr. Powell received notice that Mrs. Owens had filed this action, defendant persisted in denying any duty to pay maintenance and cure. On May 20, 1983, defendant entered an offer of judgment on plaintiff's maintenance and cure claims; defendant offered $360.00 in satisfaction of plaintiff's maintenance claim and $100.00 for cure, for a total offer of $460.00. Such an offer, made more than fifteen months after defendant knew plaintiff had become ill while serving on defendant's boat and almost eleven months after suit was filed, does not negate defendant's callousness.

Because of Conticarriers' callous, recalcitrant, arbitrary and capricious refusal to pay Mrs. Owens maintenance and cure, the Court finds Mrs. Owens is entitled to an award of attorney's fees, the exact amount of which will be determined by the Court at a later date.

B. *Recovery of Punitive Damages in Addition to Attorney's Fees*

At least one circuit court of appeals and one district court have held that when a shipowner has arbitrarily and capriciously refused to pay adequate maintenance, and award of punitive damages need not be limited to recovery of attorney's fees. *See Robinson v. Pocahontas, Inc.*, 477 F.2d 1048 (1st Cir.1973); *Harper v. Zapata Off-Shore Co.*, 563 F.Supp. 576 (E.D.La.1983). On the other hand, the Second Circuit has held that, in an action for maintenance and cure, an award of punitive damages is limited to recovery of attorney's fees. *Kraljic v. Berman Enterprises, Inc.*, 575 F.2d 412 (2d Cir.1978). This Court has not located, nor have the parties cited, any Sixth Circuit authority on point. The Court has therefore considered the case law and policy considerations underlying both points of view.

Both *Robinson v. Pocahontas, supra,* and *Harper v. Zapata Off-Shore Co., supra,* allow recovery of punitive damages not limited to attorney's fees in actions for maintenance and cure. In both cases the holding is based on the Supreme Court's decision in *Vaughan v. Atkinson,* supra. Seaman Vaughan had been forced to hire an attorney (on a 50% contingent fee) and sue the shipowner in order to recover the maintenance and cure rightfully his. The Supreme Court stated "[w]hile failure to give maintenance and cure may give rise to a claim for damages for the suffering and for the physical handicap which follows, the recovery may also include 'necessary expenses.'" *Vaughan v. Atkinson,* 369 U.S. at 530, 82 S.Ct. at 999 (citations omitted). The Supreme Court reversed both the district court and the court of appeals and held that the plaintiff seaman was entitled to recover attorney's fees when the shipowner had been

> callous in their attitude, making no investigation of libellant's claim and by their silence neither admitting nor denying it. As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old. The default was willful and persistent. It is difficult to imagine a clearer case of damages suffered for failure to pay maintenance than this one.

*Id.* at 530–31, 82 S.Ct. at 999–1000 (footnote omitted). In his dissent Justice Stewart distinguished the compensatory nature of an award of attorney's fees, as implied by the majority's discussion of "necessary expense" from the punitive nature of the award of attorney's fees based on the majority's discussion of the shipowner's callous attitude.

> The second issue presented in this case is whether the petitioner should have been awarded damages in the amount of the counsel fees incurred in bringing his action for maintenance and cure. The Court held in *Cortes v. Baltimore Insu-*

*lar Line,* supra [287 U.S. 367] at 371, 53 S.Ct. [173] at 174 [77 L.Ed. 368], that "[i]f the failure to give maintenance or cure has caused or aggravated an illness, the seaman has his right of action for the injury thus done to him; the recovery in such circumstances including not only necessary expenses, but also compensation for the hurt." But neither the Cortes decision, nor any other that I have been able to find, furnishes a basis for holding as a matter of law that a seaman forced to bring suit to recover maintenance and cure is also entitled to recover his counsel fees. Cortes dealt with compensatory damages for a physical injury, and the opinion in that case contains nothing to indicate a departure from the well-established rule that counsel fees may not be recovered as compensatory damages. McCormick, Damages, § 61.

However, if the shipowner's refusal to pay maintenance stemmed from a wanton and intentional disregard of the legal rights of the seaman, the latter would be entitled to exemplary damages in accord with traditional concepts of the law of damages. McCormick, Damages, § 79. While the amount so awarded would be in the discretion of the fact finder, and would not necessarily be measured by the amount of counsel fees, indirect compensation for such expenditures might thus be made. See *Day v. Woodworth,* 13 How. 363, 371, 14 L.Ed. 181.

*Id.* at 539–40, 82 S.Ct. at 1004 (Stewart, J., dissenting).

In *Vaughan,* the Supreme Court did hold that when a shipowner had callously refused to pay maintenance and cure, the seaman was entitled to an award of attorney's fees. The Supreme Court did not hold that punitive damages in excess of attorney's fees were recoverable.

The Second Circuit considered this problem fully in *Kraljic v. Berman Enterprises, supra,* and "found no authority [for] awarding separately both punitive damages and attorney's fees. On the contrary, the routine practice has been for plaintiffs' counsel to include simply a demand for counsel fees in all maintenance and cure cases; the award is permitted where the defendant's conduct has been willful and persistent." 575 F.2d at 415 (footnote omitted) (citation omitted). The Second Circuit pointed out that in *Vaughan* the majority opinion

limited that recovery to counsel fees despite the explicit view of the dissenters that no such curb be imposed. As the dissenting opinion pointed out, there had been no previous holding of the Court permitting an award of punitive damages in such cases. See 369 U.S. at 539–40, 82 S.Ct. 997. It was created by the majority, which was obviously sensitive to the plight of seamen and to the liberality shown by admiralty courts in interpreting this historical duty of providing maintenance and cure for the benefit of its wards, the seamen. Yet the majority saw fit to go no further than to allow punitive damages limited to counsel fees.

We acknowledge that there is much to be said for the argument that if punitive damages are to be awarded there should be no reason to so limit them uniquely in maintenance and cure cases. Nonetheless, this is the holding of the *Atkinson* majority and we feel constrained to follow it.

575 F.2d at 416 (footnote omitted).

This Court feels similarly constrained and holds that because defendant's refusal to pay maintenance and cure was callous and willful, plaintiff is entitled to an award of punitive damages *limited to attorney's fees.*

C. *Recovery of medical expenses previously paid under group health insurance policy*

▆ Plaintiff has included in her claim for cure all medical and hospital expenses arising out of the pneumonia she contracted while serving on defendant's vessel. Defendant contends it is entitled to a setoff for all plaintiff's medical expenses paid under the Equitable group health insurance policy. Plaintiff contends defendant is not entitled to take credit for amounts paid by

Equitable since such payments represent collateral source benefits.

In *Haughton v. Blackships, Inc.*, 462 F.2d 788 (5th Cir.1972), a seaman sued for personal injuries and the issue arose whether the seaman's maritime pension could be considered in mitigation of damages. The money in the retirement fund was contributed by the employer, but the fund was established through a contract between the employer and the union. The Fifth Circuit reasoned:

> In considering the applicability of the collateral source rule, the basic principle to be applied is that the employer-tortfeasor is not entitled to mitigate damages by setting off compensation received by the employee from an independent source. However, it is also true that the source of the funds may be determined to be collateral or independent, even though the employer-tortfeasor supplies such funds, *United States v. Price*, 288 F.2d 448 (4th Cir. 1961). *See also* Annot., 75 A.L.R.2d 886 (1961).
>
> Application of the collateral source rule depends less upon the source of funds than upon the character of the benefits received, *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534–535 (9th Cir.1962).[1] The mere fact that the employer-tortfeasor has contributed money (by payment of premiums, contributions, etc.) to the fund from which the benefits derive does not establish that such fund may not be a collateral source, *Hall v. Minnesota Transfer Ry. Co.*, 322 F.Supp. 92, 95 (D.Minn.1971), and cases cited therein.

*Id.* at 790.

The issue whether an employee's group health insurance benefits are a collateral source when the policy's premiums are paid by the employer has been thoroughly analyzed in two district court opinions. In *Hall v. Minnesota Transfer Railway Co.*, 322 F.Supp. 92 (D.Minn.1971), an action under the FELA, the district court held a medical/hospitalization policy, the premiums for which were paid by the employer

directly to the insurer, was a collateral source. The Court stated:

> The collective bargaining contract between that employee group and the defendant Railroad includes, as an economic term, a requirement that the employer pay premiums directly to the insurer, much as an employer might at the direction of his employee deduct money from wages and forward them directly to that employee's creditor or bank savings plan. This policy is, in short, a fringe benefit given in part consideration for the employee's services. It is in no sense a mere gratuity nor an arrangement by which the company has undertaken voluntarily to indemnify itself against possible liabilities to injured employees under the FELA.

*Id.* at 96.

In *Seifried v. Mon River Towing Inc.*, 388 F.Supp. 233 (W.D.Penn.1974), the district court held benefits and medical expenses paid under a group insurance policy were a collateral source. Even though the defendant shipowner had paid the policy premiums, the district court held that

> The policy considerations for the collateral source rule are apparent. On the one hand, an employer-tortfeasor who voluntarily undertakes to indemnify itself against liability by payment into a fund for that purpose, should not be penalized by permitting the plaintiff a double recovery of his benefits under the fund as well as his full measure of damages. On the other hand, where the employer-tortfeasor makes payment directly or indirectly into a fund established for an independent reason, or where such payment by the employer should be considered in the nature of a fringe benefit or deferred compensation, the employer should not be entitled to benefit by setting off such income in mitigation of his responsibility as a tortfeasor.

Applying the principles as set forth in *Thomas* and *Haughton*, it is apparent to the Court that the policy here in question was established for an independent rea-

son outside of indemnification for liability and thus must be considered in the nature of a fringe benefit and the employer can then not set-off such amount in mitigation of its responsibility. Accordingly, the Plaintiff is entitled to the full amount of the Maintenance Claim of $8,208.00 without deduction for the amounts paid by Travelers Insurance Company.

*Id.* at 239.

In contrast, the Third Circuit has held the collateral source rule inapplicable to an action for maintenance and cure. *Shaw v. Ohio River Co.*, 526 F.2d 193, 201 (3d Cir. 1975). There the Court of Appeals allowed the defendant shipowner to credit against the amount of cure the amounts paid under plaintiff seaman's health insurance policy. *Id.* But the Third Circuit stated "[plaintiff] urges that the collateral source rule should govern this issue. If this were a Jones Act or a FELA case, there would be some substance to her argument." *Id.*

The Court finds plaintiff is entitled to an award of cure including all medical expenses without regard to whether those expenses were paid under the group health insurance policy. The Court finds that premiums for such policy were paid by defendant as a fringe benefit of employment, not as a means of insuring against liability. Defendant's own insurance and claims manager testified that the group health insurance policy was not a marine liability policy and was not intended to cover illness acquired in the course of a crew member's employment. The Court finds in the situation presented here Mrs. Owens is entitled to an award of cure totaling $8,455.45 for medical expenses arising from the January, 1982, illness.

## CONCLUSION

In summary, the Court denies defendant's motion to reopen the case for additional evidence. The Court finds, under the Jones Act, defendant Conticarriers breached its duty to provide adequate medical care to Mrs. Owens for illness she suffered while serving on defendant's boat. The Court finds defendant owed Mrs. Owens maintenance and cure for the aforementioned illness and moreover defendants callously and wilfully refused to pay such maintenance and cure. The Court therefore awards damages to plaintiff Owens, with judgment to be entered as follows: compensatory damages for pain and suffering—$25,000; punitive damages—attorney's fees; maintenance—$665.00; cure—$8,455.45. The attorneys for the parties are directed to confer regarding the amount of plaintiff's attorney's fees and are to notify the Court within ten days of entry of this order whether they have reached agreement on such amount. If no agreement has been reached, the Court will set a hearing on the amount of attorney's fees owed to plaintiff by defendant.