Helen SHAW

v.

OHIO RIVER COMPANY, Appellant.

No. 75–1301.

United States Court of Appeals,
Third Circuit.

Argued Sept. 10, 1975.

Decided Nov. 4, 1975.

194

Hymen Schlesinger, Pittsburgh, Pa., for appellee.

Anthony J. Polito, Rose, Schmidt and Dixon, Pittsburgh, Pa., for appellant; John H. Riordan, Pittsburgh, Pa., of counsel.

Before ALDISERT, GIBBONS and WEIS, Circuit Judges.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

The Ohio River Company, owner of towboats operating on the Ohio River, appeals from an order of the district court awarding judgment in favor of one of its seapersons, Helen Shaw, for maintenance and cure in the amount of $7,724.31.[1] In her amended complaint Shaw sought maintenance and cure payments for three distinct periods of illness during 1971, 1972 and 1973. Her illness in 1973 first occurred while she was aboard the motor vessel "Robert P. Tibolt" while employed as a maid and cook. The symptoms of her illnesses in 1971 and 1972, however, manifested themselves while she was on shore leave pursuant to the accumulated leave time policy contained in the collective bargaining agreement with her employer. The Ohio River Company concedes that it is liable for maintenance and cure payments for the 1973 illness but denies its liability for the 1971 and 1972 illnesses. Alternatively, it argues that even if it is liable for maintenance and cure, it is entitled to a credit or set-off for accumulated leave time wages and for non-contributory, non-occupational insurance and hospital benefits which had already been paid to Shaw.

Confronted by these two issues of first impression in this Circuit, we conclude that Shaw is not entitled to maintenance and cure payments for her 1971 and 1972 illnesses, and that the Ohio River Company is entitled to a set-off only for the hospitalization and medical treatment in connection with the 1973 illness which had been furnished at the expense of Blue Cross-Blue Shield.

I. THE 1971 AND 1972 ILLNESSES

In 1971 and 1972 Shaw was employed on the M/V Beckjord pursuant to a collective bargaining agreement which provided for regular crew changes and accu-

---

1. The order specified that $2,583 was for maintenance and $5,141.23 constituted reimbursement for hospital and medical expenses.

mulated free time. On June 28, 1971 she left the motor vessel on a regular crew change with accumulated leave time to August 11, 1971. On July 12, 1971, however, she went to a physician for a routine physical examination during which a breast tumor was discovered. There had been no prior symptoms or complaints of this condition. She was subsequently admitted to a hospital for surgery and was also treated for other illnesses not caused by or manifested while in the service of the vessel.[2] On December 9, 1971 she returned to duty. The district court awarded maintenance for 141 days in 1971, less twelve days during which Shaw was in a United States Public Health Service hospital, and cure in the amount of her hospital and medical bills.

On March 12, 1972 Shaw left the M/W Queen City on her regular crew change with accumulated leave time to April 23, 1972. On March 14, 1972 she first experienced a leg cramp for which she was later treated by United States Public Health Service Physicians. This malady disabled her until May 5, 1972 when she returned to duty. The district court awarded maintenance for 51 days. Since all her medical treatment for the 1972 illness had been provided free of charge by the United States Public Health Service, Shaw made no claim for reimbursement.

The undisputed testimony of Robert Langdon, defendant's personnel manager, establishes that when a regular crew change occurs and a seaman departs the vessel on accumulated leave time he is no longer answerable to the call of duty. He is entirely free during accumulated leave time to follow his own pursuits.[3] This testimony is consist-

---

2. These other illnesses included restless leg syndrome, chronic sinusitis, cystocele with symptomatic cystitis and obesity.

3. The Personnel Manager testified as follows:

*By Mr. Polito:*

Q. What restriction does the company put on the employee's activities while he is on his free time?

A. No restriction whatever.

*The Court:* In other words, if a person wants to drive for Yellow Cab during the thirty days that they are off, that is their business?

*The Witness:* Yes. Many people will moonlight, more for taking up time, and also for money, because of the inflationary factors.

*By Mr. Polito:*

Q. Does this have anything to do with their receipt of monies that you would pay them?

A. None whatsoever.

Q. Do they have any obligation to report their activities to the company in any way?

A. None whatsoever.

Q. Would you state if they have any obligation to return to work, if called during their free time?

A. They don't have any obligation to return to work during their free time; except that they may report in . . . two or three days before their free time expires, making themselves available.

*The Court:* Well, suppose you would get some rush order or something, and call on a seaman, is that seaman required to report, or is it at the discretion of the seaman?

*The Witness:* Well, there are a multiple of things that could happen. Some of the seamen get hurt—

*The Court:* Or, if one had a death in the family.

*The Witness:* (Continuing)—or, someone gets sick or something, you have to have someone come by. So, you generally go to someone who has the least number of days; or, maybe you would go to someone in the proximity. Say, someone got off in Pittsburgh. Then, it would be nice if you had a boy who lived in this area.

Now, if there is somebody that you called in the place of somebody who got off—and this has happened many times—it is out of the goodness of their heart. But, they wouldn't have to.

*The Court:* They would not have to?

*The Witness:* They do not have to.

In fact, we would beg them. And if we asked them, and they said that they didn't want to, or that they couldn't do it, we couldn't do a thing about it. They may have good reason.

*By Mr. Polito:*

Q. Well, what effect would this have with his continued employment with the company?

A. The way I look at it, and the way the company looks, as well, is that he is entitled to that. There's no hard feelings. That's just the way it is. And there is no mention of anything in his personnel file for uncooperativeness or anything like that. There's no hard feelings. (App. at 33a–34a).

ent with the terms of the collective bargaining agreement (Def. Exhibit A). Moreover, there is no evidence from which a finding could be made that on July 12, 1971 or on March 14, 1972 Shaw was answerable to the call of duty. The district court, however, held to the contrary:

> "The Court is satisfied that in each of the situations presented, plaintiff did sustain her various illnesses while subject to the call of service and thus would be entitled to maintenance and cure. . . . The fact that plaintiff was on shore leave at home at any time in question would not preclude entitlement to maintenance and cure." *Shaw v. The Ohio River Company,* 388 F.Supp. 229 (W.D.Pa.1975).

If the quoted holding was intended as a finding of fact, then it is clearly erroneous, for the only evidence is unequivocally to the contrary. Shaw urges instead that the holding constituted a legal conclusion that a vessel's obligation to provide maintenance and cure to inland water commuter seamen continues during accumulated leave time whether or not the seaman is answerable to the call of duty and whether or not the illness was caused by his service. This conclusion finds no support in prior case law and is inconsistent with recent restrictions imposed upon the right of commuter seamen to the remedy of maintenance and cure.

■ The right of a seaman to the remedy of maintenance and cure when falling ill or injured "while in the service of the ship" has been recognized by maritime nations since at least the Middle Ages. *See* 2 M. Norris, The Law of Seamen §§ 538–43, at 1–15 (3d ed. 1970). Recognition of the seaman's right to this remedy first appeared in American maritime law in *Harden v. Gordon,* 11 Fed. Cas. 480 (No. 6,047) (C.C.D.Me.1823).[4] The requirements for being considered in

the ship's service, however, have undergone significant developments. In *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 529, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938), the Supreme Court while recognizing that in most prior cases "the efficient cause of the injury or illness was some proven act of the seaman in the service of the ship", noted in dictum that there were others where "it was deemed enough that he was incapacitated when subject to the call of duty . . . ."[5] The Court expressly adopted this no-causal relationship test in *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 733, 63 S.Ct. 930, 87 L.Ed. 1107 (1943), holding that a seaman injured while on authorized shore leave should be held to be "in the service of the ship" even though the leave had been granted for "exclusively personal" reasons which had "no relation to the vessel's business." Justice Rutledge explained the reasons for extending the principles governing shipboard injuries to cover seaman Aguilar's plight. "To relieve the shipowner of his obligation in the case of injuries incurred on shore leave," he argued:

> "would cast upon the seaman hazards encountered only by reason of the voyage. The assumption is hardly sound that the normal uses and purposes of shore leave are 'exclusively personal' and have no relation to the vessel's business. Men cannot live for long cooped up aboard ship without substantial impairment of their efficiency, if not also serious danger to discipline. Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly. . . . In short, shore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion." *Id.* at 733–34, 63 S.Ct. at 935.

The meaning of "in the service of the ship" was further refined in *Farrell v.*

---

4. A recent discussion of the historical development of this remedy can be found in *Cox v. Dravo Corp.,* 517 F.2d 620 (3d Cir. 1975) (en banc).

5. The Court cited *The Banker No. 2,* 241 Fed. 831, 835 (2d Cir. 1917), and *The Wensleydale,* 41 Fed. 829 (E.D.N.Y.1890), in support of this proposition.

*United States,* 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949), where a seaman was injured while returning to ship after overextending his shore leave. The Court reasoned that a seaman is deemed to be "in the service of the ship" as long as he is "generally answerable to its call of duty." *Id.* at 516, 69 S.Ct. at 709. *See Warren v. United States,* 340 U.S. 523, 530, 71 S.Ct. 432, 95 L.Ed. 503 (1944).

These decisions, it should be noted, dealt with traditional "blue water" seamen who endured the hazardous and unique life associated with extended voyages to foreign ports. Shaw's 1971–72 claims involve a qualitatively different factual setting. A leading treatise has recognized the problem now confronting this court:

> "The Supreme Court's extension of the maintenance and cure remedy to shore leave injuries has led to some uncertainty in subsequent lower court decisions in cases which involve what have been called 'commuter seamen'— that is seamen who live at home and commute to work daily or who spend fixed periods on the vessel and on shore . . . . Whether they are also entitled to maintenance and cure for injuries suffered during their periods on shore is a question as to which a certain amount of judicial disagreement appears to be developing . . . . The Fifth Circuit seems to be in the course of working out a fairly complicated distinction based on whether the plaintiff was or was not 'answerable to the call of duty' at the time of his injury. . . ." G. Gilmore & C. Black, The Law of Admiralty § 6–8, at 292 (2d ed. 1975) (footnotes omitted).

The Fifth Circuit decision referred to is *Sellers v. Dixilyn Corp.,* 433 F.2d 446 (5th Cir. 1970) (per curiam), *cert. denied,* 401 U.S. 980, 91 S.Ct. 1214, 28 L.Ed.2d 332 (1971), in which the court held that an injured seaman must prove (1) that he was on authorized shore leave and (2) that he was answerable to the call of duty in order to qualify for maintenance and cure. Seaman Sellers worked on an off-shore oil rig. Under his contract of employment he worked on a schedule providing for a sequence of seven-day tours of duty followed by seven-day periods of authorized leave. While off-duty Sellers was permitted to spend his time as he pleased, including engaging in other employment. And while off-duty there was no obligation to return to work even if he were called for an emergency. This decision was considered to be purely discretionary on the seaman's part. The Fifth Circuit found Sellers to be neither on authorized shore leave nor answerable to the call of duty and, therefore, denied his claim for maintenance and cure. In reaching its decision the court emphasized that his "leave . . . bore little resemblance to the shore leave of the traditional blue water seaman." *Id.* at 448. The requirement that a seaman be answerable to the call of duty at the time of illness or accident has been followed and amplified in at least two other Fifth Circuit decisions, *Daughdrill v. Diamond M. Drilling Co.,* 447 F.2d 781 (5th Cir. 1971), *cert. denied,* 405 U.S. 997, 92 S.Ct. 1261, 31 L.Ed.2d 466 (1972), and *Baker v. Ocean Systems, Inc.,* 454 F.2d 379 (5th Cir. 1972).

This requirement had earlier been adopted for "blue water" seamen on vacation by the First Circuit in *Haskell v. Socony Mobil Oil Co.,* 237 F.2d 707 (1st Cir. 1956). In that case a seaman was allowed to take 46 days' vacation which had accrued to him in accordance with his collective bargaining agreement so that he could attend to certain personal matters pertaining to his father's death. While off-duty he was injured in an atuomobile accident and brought suit to recover maintenance during his subsequent period of incapacity. The court recognized that recovery was predicated on a showing that the injury occurred while "in the service of the ship." In denying the requested relief the court reasoned:

> "Shore leave consisting of brief periods ashore in home or foreign ports *in the course of a voyage,* or perhaps even before a voyage begins or after it

has terminated, is, no doubt, a usual, traditional, and perhaps essential incident of a seaman's employment. Furthermore during such leave the seaman in a sense is in the service of his ship, for we suppose he could be called back on board, if he could be found, to cope with any shipboard emergency which might arise in port. But protracted vacations are not of 'elemental necessity in the sailing of ships, a part of the business as old as the art.' They are not traditional in maritime employment; they are the product of modern collective bargaining agreements now generally common in all employments both at sea and ashore. *And during vacation periods we cannot assume that the seaman is answerable to the call of duty, and hence in a sense is 'in the service of the ship.'*" *Id.* at 710 (emphasis supplied).

■ We think the cases in the First and Fifth Circuits are consistent with the Supreme Court's holdings in *Aguilar* and *Farrell.* Read together, those cases mandate a finding that a seaman who becomes sick or injured on shore leave be answerable to the call of duty before he can be held to be in the service of the vessel for the purpose of maintenance and cure.[6] Shaw, nonetheless, urges that the issue is foreclosed in this circuit by a dictum in *German v. Carnegie-Illinois Steel Corp.,* 169 F.2d 715 (3d Cir. 1948). In *German* the seaman sought recovery under the Jones Act for unseaworthiness as well as for maintenance and cure. He had initially been injured, suffering head and body injuries, after slipping on oil and grease in the ship's engine room. However, he continued to work over the next three weeks before taking a five-day shore leave which the court described as part of the "regular routine" of days off following days on. *Id.* at 716 & n. 1. On his third day of leave he was stricken unconscious while

walking on the street and was hospitalized. His condition was diagnosed as cerebral thrombosis, and as a result, the seaman suffered partial paralysis. The only issue before the court was the validity of a release of liability obtained by his employer. The court sustained the jury's finding that the release was invalid. The sole reference to maintenance and cure is found in this short paragraph:

"Putting aside for the moment the accident on April 15, 1944, it is of paramount importance to note that the plaintiff was stricken while on shore leave on May 8, 1944. He thereupon became entitled to maintenance and cure: *Aguilar v. Standard Oil Company,* 1943, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107, . . ." (balance of citations omitted). *Id.* at 718.

There is obviously no discussion of the "answerable to the call of duty" requirement in the opinion because the Supreme Court decision which first announced it—*Farrell v. United States*—was not handed down until a year later in 1949. Neither this circuit's nor the district court's opinion[7] in *German* disclose, whether under the terms of his employment, the seaman was under any obligation to answer the call of duty while on shore-leave. The case is also distinguishable because the jury verdict had resolved in plaintiff's favor the disputed issue whether the collapse on shore leave was caused by the injury received on the vessel. Since the injury occurred on board, the duty of maintenance and cure continued until maximum cure was attained.[8] Thus, *German* is not dispositive of the issue before us.

■ Since the undisputed evidence indicates that Shaw was not answerable to the call of duty when she was stricken in 1971 and 1972 with illnesses which did not manifest themselves while in the

---

6. *See also George v. Chesapeake & Ohio Ry. Co.,* 348 F.Supp. 283 (E.D.Va.1972).

7. *German v. Carnegie-Illinois Steel Corp.,* 75 F.Supp. 361 (W.D.Pa.1948).

8. *See Cox v. Dravo Corp., supra.*

service of the vessel, the district court erred in awarding maintenance and cure payments for those periods.

## II. THE 1973 ILLNESS

The Ohio River Company concedes that Shaw reported ill while on board its motor vessel on April 6, 1973, and, it therefore is liable for maintenance and cure. Shaw was taken by ambulance from the vessel to Ohio Valley General Hospital in Wheeling, West Virginia, where she was hospitalized until April 13, 1975. Subsequently she was treated in various other hospitals. She applied for, and, effective July 1, 1973, began receiving a disability pension pursuant to a Pension Plan provided for in the collective bargaining agreement between the vessel owner and her union. She received full wages covering accumulated leave time up to and including April 10, 1973. Moreover, after April 6, 1973 Shaw applied for and received weekly benefits of $75.00 a week under a non-contributory group insurance policy also funded by defendant pursuant to the collective bargaining agreement. This policy covered non-occupational disabilities and furnished benefits to Shaw for the maximum period of twenty-six weeks, from April 11 to October 11, 1973, totaling $1949.97. In addition, because of a non-contributory group health insurance policy funded by defendant pursuant to the collective bargaining agreement, Shaw received $3,898.05 in Blue Cross-Blue Shield benefits which covered the major part of the $4173.16 in medical and hospital expenses she incurred after April 6, 1973. The remaining $275.11 in medical and hospital expenses was met in the following manner: the vessel owner paid $60.00; the United States Public Health Service paid $137.00; Mrs. Shaw paid $48.11; and Dr. Hand, a treating physician, adjusted his bill by $30.00.

The district court awarded maintenance for 187 days in 1973, from April 7 to October 10, 1973, at a stipulated rate of $7.00 per day.[9] The Ohio River Company claims a credit against this total of $1309.00 for (1) four days wages paid as accumulated leave time, from April 6 to April 10, 1973; and (2) payments made by the Prudential Insurance Company under its non-occupational disability policy. The district court also awarded cure for the 1973 illness totalling $3946.16. This amount credited only the $60.00 paid by the defendant, the $137.00 paid by the United States Public Health Service, and the $30.00 adjustment by Dr. Hand. The vessel owner claims a credit for the $3,898.05 in benefits furnished by Blue Cross-Blue Shield.

### A. The Claimed Credits Against Maintenance

#### 1. Accumulated Leave Time Pay

Maintenance is the equivalent of the food and lodging to which a seaman is entitled while at sea, even if he is ill or injured. It is not a substitute for wages. *See Cox v. Dravo Corp., supra.* Accumulated leave time, on the other hand, is part of the seaman's wage agreement. The vessel owner contracts with a seaman to pay him not only for the period he actually performs services but also over a longer period which represents the extra time he has earned while aboard ship. In effect, accumulated leave time is a method of deferred wage payment.

It is clear that in the absence of an explicit contractual provision specifying that accumulated leave time pay or other wages is to be deemed a substitute for maintenance, there is no basis for crediting such earned wages against the vessel owner's maintenance obligation. *See Ward v. Union Barge Line Corp.,* 443 F.2d 565 (3d Cir. 1971); *Haywood v. Jones & Laughlin Steel Corp.,* 107 F.Supp. 108 (W.D.Pa.1952). The Ohio River Company, however, relies on *McCarthy v. American Eastern Corpora-*

9. The calculations in this section are based solely on the 1973 illness since we have held in Part I of this opinion that Shaw is not entitled to maintenance and cure for the 1971 and 1972 illnesses.

*tion*, 175 F.2d 727 (3d Cir. 1949), to support the proposition that one cannot claim maintenance for any period of time for which he has already claimed and recovered full wages. This reliance is misplaced for two reasons. First, the principle, if it exists at all, is inapplicable in this case, for accumulated leave time is deferred wages, and in no way duplicates the employer's maintenance obligation for the later period of disability. Second, *McCarthy* does not stand for the proposition that an employer may not be liable for both wages and maintenance during the same period. It holds, instead, that in a Jones Act case when an employee recovers damages for lost earnings, which includes both wages and the room and board he would have received while on board, he cannot in a subsequent action recover maintenance—room and board—for this same period.[10] Accordingly, since the payment to Shaw of accumulated leave time involved no duplication of the maintenance claim for the period April 6 to April 10, 1973, the vessel owner is not entitled to a credit.

### 2. The Prudential Non-Occupational Disability Policy

■ Pursuant to the terms of the collective bargaining agreement, the vessel owner paid the premium on a policy which provided for weekly payments during periods of non-occupational disability. Clearly the premiums were payments made pursuant to a wage agreement. In contrast with the factual context of *Thomas v. Humble Oil & Refining Company*, 420 F.2d 793 (5th Cir. 1969), the collective bargaining agreement in this case contained no provision specifying that payments from the insurance company under the benefits plan would be in lieu of maintenance. Undoubtedly a vessel owner could insure against his maintenance obligation by a benefits program tailored to that end but there is no indication in the collective bargaining agreement before us

that this was done. Instead, the employer's premium obligation appears to be simply a part of the wage package.

Benefits payable under the Prudential policy for periods of non-occupational disability are, like the accumulated leave time payments, in the absence of an agreement to the contrary, a form of deferred compensation. *See Ward v. Union Barge Line Corp., supra; Haywood v. Jones & Laughlin Steel Corp., supra.* They are designed to replace lost wages, not to provide room and board and medical treatment. Moreover, the benefits have nothing to do with the vessel owner's separate maintenance obligation, for they would be payable even if Shaw were ineligible for maintenance. A credit against that obligation, therefore, would be inappropriate. *Cf. Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 535–36 (9th Cir. 1962).

Our conclusion with respect to the wage character of the non-occupational disability benefits is in no way dependent upon the so-called collateral source rule which we believe is not applicable in this case. *But see, e. g., Haughton v. Blackships, Inc.*, 462 F.2d 788 (5th Cir. 1972) and cases cited therein.

### B. The Claimed Credit Against Cure

■ As a general proposition a "seaman's recovery for maintenance and cure is limited to the amount he actually expended or the liability he has actually incurred for his maintenance while being cured." 2 M. Norris, *supra* § 572, at 90. Thus, as the district court properly recognized, the vessel owner incurred no liability for the medical services rendered to Shaw at the expense of the United States Public Health Service. Similarly, Shaw, it should be noted, did not incur any expense or liability for the medical care and hospitalization covered by her Blue Cross-Blue Shield insurance. For this reason, we conclude that the Ohio River Company should not be charged

---

**10.** To the extent that *Evans v. Schneider Transportation Company*, 250 F.2d 710, 712 (2d Cir. 1957), reads *McCarthy* more broadly we decline to follow it.

the expense of medical treatment furnished by Blue Cross-Blue Shield.

Shaw, however, contends that the Blue Cross-Blue Shield benefits should be treated in the same manner as the Prudential policy payments. She presents two independent reasons for this position both of which ignore the nature of these policies. First, Shaw points out that the Blue Cross-Blue Shield coverage at her employer's expense was bargained for and required by the collective bargaining agreement and, thus, should be deemed a part of earned wages. This argument confuses two separate problems. It is true that Blue Cross-Blue Shield coverage, even for illnesses with respect to which the vessel owner owes no obligation to seamen, was bargained for and obtained in the wage agreement. But it is also true that the vessel owner has no obligation to provide maintenance and cure if it is furnished by others at no expense to the seaman. *See, e. g., Vaughan v. Atkinson,* 369 U.S. 527, 533, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *Johnson v. United States,* 333 U.S. 46, 50, 68 S.Ct. 391, 92 L.Ed. 468 (1947); *Mahramas v. American Export Isbrandtsen Lines, Inc.,* 475 F.2d 165 (2d Cir. 1973).[11] The essential difference between the Blue Cross-Blue Shield and the Prudential payments is that the former provides the exact equivalent of maintenance and cure whereas the latter, at least under this collective bargaining agreement, constitutes a substitute for lost wages which are owed to a seaman even if he is ineligible for maintenance and cure.

Second, Shaw urges that the collateral source rule should govern this issue. If this were a Jones Act or a FELA case, there would be some substance to her argument. *See, e. g., Eichel v. New York Cent. R. R.,* 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963) (per curiam); *Blake v. Delaware & Hudson Ry. Co.,* 484 F.2d 204 (2d Cir. 1973). *Cf. Wagner v. Reading Co.,* 428 F.2d 289 (3d Cir. 1970). But a vessel owner's duty to provide maintenance and cure arises independently of any considerations of fault and without regard to whether or not the seaman's disability is causally related to his employment. Whatever justification there may be for the collateral source rule in situations where liability is based on fault, there is no perceivable basis for applying it to the no-fault obligation to furnish maintenance and cure. *See generally, Gypsum Carrier, Inc. v. Handelsman, supra* 307 F.2d at 535.

Liability for hospitalization and medical treatment provided at the expense of Blue Cross-Blue Shield, therefore, should not have been imposed upon the vessel owner, and the judgment must be reduced to reflect a credit for such payments. The record suggests that Shaw had been a patient at various hospitals, including a United States Public Health Service Hospital, for 65 days in 1973. If during these periods of hospitalization she received food and lodging, there may be a question of credit against the maintenance claim for those days. We are unable to ascertain from the record whether or not a claim for such a credit was removed from the case by stipula-

---

11. A leading treatise, G. Gilmore & C. Black, *supra* § 6–12 at 305–06, suggests that "[i]n recent litigation, however, the idea seems to have been making its way that the right to maintenance, whatever the origins of the right may have been, should not be restricted in any of the ways that have been suggested." We fail to see even the outline of such a trend. In the major case the authors cite in support of this statement, *Haughton v. Blackships, Inc.,* 462 F.2d 788 (5th Cir. 1972), the maintenance and cure award was restricted to an amount based on ascertainable need.

Gilmore and Black also point out that in recent cases, just as in this case, maintenance has been awarded at a flat rate per day without inquiry into whether or not it is sufficient as a living allowance. G. Gilmore & C. Black, *supra,* § 6–12 at 307. The authors conclude, without citations for support, that this is why the "not uncommon inquiry into plaintiff's collateral earnings" has been abandoned by the courts. *Id.* at 307. We again see no such trend developing and would caution that this position ignores the historical and legal foundations for granting maintenance and cure.

tion. That determination should be made by the district court.

The judgment of the district court will be vacated and the case remanded for the entry of a judgment awarding maintenance and cure with respect to Shaw's 1973 illness, calculated in accordance with this opinion.