**Kerwin A. YOST, Plaintiff,**

v.

**AMERICAN OVERSEAS MARINE CORP., Defendant.**

**No. 2:91cv820.**

United States District Court,
E.D. Virginia,
Norfolk Division.

July 15, 1992.

Ralph Rabinowitz, Rabinowitz, Rafal, Swartz, Taliaferro & Gilbert, P.C., Norfolk, Va., for plaintiff.

A. Jackson Timms, D. Arthur Kelsey, Hunton & Williams, Norfolk, Va., for defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this action based solely on diversity jurisdiction, the plaintiff, Kerwin A. Yost ("Yost"), asserts two causes of action both of which are said to arise under the general admiralty laws of the United States, as well as under all other laws of the United States and unspecified state law. At oral argument, counsel for Yost explained that Yost's admiralty causes of action were for breach of the warranty of seaworthiness and negligence; conceded that there were no state law claims; and advised that the only other possible claim might be under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 et seq., and then only through application of the Defense Base Act. 42 U.S.C. §§ 1651 et seq. The defendant, American Overseas Marine Corp. ("American Overseas"), operates the M/V 1st. LT. BALDOMERO LOPEZ (the "Vessel").

In its answer, American Overseas admits that it is the owner and the operator of the Vessel. (Answer, ¶ 3). However, in its summary judgment papers, American Overseas has shown that it is the operator of the Vessel pursuant to a contract between it and Braintree III Maritime Corporation ("Braintree") to which the Vessel was demised pursuant to a bareboat charter between Braintree and Wilmington Trust Company, as shipowner under a trust agreement. (Sherman Declaration, ¶¶ 2 and 3; and Sherman Declaration Exhibit A). For purposes of this motion, there is no substantive significance attached to this matter but if, as the current record seems to establish, American Overseas is not the Vessel's owner and is only its operator, the Answer should be amended to reflect those facts.

Braintree and the United States are parties to a Maritime Prepositioning Ship Time Charter Party (the "Charter Party") pursuant to which the Vessel is chartered by the Department of Defense and strategically placed in foreign ports or at sea so that it will be available to respond to military emergencies as directed by the Department of Defense. (Sherman Declaration, ¶¶ 2, 3 and 5; Sherman Declaration Exhibits A and B). American Overseas is contractually obligated to hire the officers and crew of the Vessel (Sherman Declaration, ¶ 4) but the Charter Party permits the use of "private civilian contract personnel" to maintain the combat readiness of the equipment kept on the Vessel for use by the United States Marine Corps (Sherman Declaration ¶ 5; Sherman Declaration Exhibit B).

Bendix Field Engineering Corp. ("Bendix") contracted with the Marine Corps Logistics Base to provide maintenance service for the Marine Corps equipment kept aboard the Vessel. (American Overseas Motion for Partial Summary Judgment Memorandum, Exhibit 3) (hereinafter "Def's. Memorandum Exhibit __"). Yost was hired by Bendix to service that equipment (Id., Exhibit 4). The employment contract specifies that Yost's employment is subject to approval by the Marine Corps (Def's. Memorandum Exhibit 4, ¶ 1). The employment contract also provides that Yost's employment location will be "shipboard" (Def's. Memorandum Exhibit 4) and that Yost should expect to remain assigned on shipboard duty for a minimum of one year (Def's. Memorandum Exhibit 4, ¶ 8).

Yost's role on the Vessel was that of repairer. Yost lived and worked aboard the Vessel. His job was to keep the Marine Corps equipment (such as ordnance, boats and jeeps) in good order and repair. The Vessel's sole purpose was to transport weaponry and equipment for use by the Marine Corps in case of military emergency. (Sherman Declaration, ¶¶ 6 and 7; Def's. Memorandum Exhibits 2, 3 and 4; Request for Admissions 1 and 3 and Responses thereto).

In May 1989, the Vessel was on the high seas in the Pacific Ocean enroute to a destination prescribed by the Department of Defense. On May 9, 1989, Yost was preparing to leave the crew's mess area where he had eaten a snack during his off-duty hours. Yost reported that, as he reached for the doorknob, his right foot slipped on the wet floor of the mess area. As Yost attempted to break his fall, he twisted his lower back. (Yost's Memorandum in Opposition to Summary Judgment Motion Exhibit 7 and 8) (hereinafter "Plf's. Memorandum Exhibit ——"). Yost was unable to work the next day and was given medication and confined to bed. Yost alleges that, as a result of the accident, he has sustained a severe, permanent back injury which ultimately caused him to terminate employment with Bendix (Complaint, ¶ 7, 11, Plf's. Memorandum Exhibit 6). The record does not establish Yost's activities from May 10, 1989, the day after the accident, until January 10, 1990, the date on which he voluntarily terminated his employment with Bendix for medical reasons.

Yost contends that the water on the floor of the mess area came from a leaking ice machine which was not kept in proper repair. This, Yost says, constituted negligence on the part of American Overseas and a breach of the warranty of seaworthiness which American Overseas owed to him (Complaint, ¶¶ 7, 9 and 10). According to Yost, the leak from the ice machine was a chronic problem known to all aboard the Vessel but the water usually was not in that part of the mess area where he fell on May 9, 1988. (Yost Deposition, pp. 32–33, Def's. Memorandum Exhibit 6). Yost says that American Overseas sought to contain the water in the area near the ice machine by placing tablecloths around the base of the ice machine. (Yost Deposition, pp. 28, 32, Plf's. Memorandum Exhibit 1).

Both parties agree that Bendix had supervisors aboard the Vessel on and before May 9, 1988. (Crew List, Plf's. Memorandum Exhibit 2; Internal Memorandumrandum from A. Canty, June 7, 1988, Plf's. Memorandum Exhibit 5; Injury/Illness Report, Plf's. Memorandum Exhibit 7). Yost testified that the Bendix employees all ate together in the area of the mess where the leak from the ice machine usually was ob-

**316**

served (Yost Deposition, pp. 26, 28, 32, 89, Plf's. Memorandum Exhibit 1). As Yost puts it: "Everybody on the ship knew there was water on the floor in the areas where we were eating." (Yost Deposition, p. 32).

According to Yost, at some unspecified time following his injury, Bendix unilaterally began to pay him workers' compensation. Yost says he made no request for such payments and filed no claim seeking them. (Request for Admissions No. 3 and Response thereto, Def's. Memorandum Exhibit 2). Yost has received $68,948.60 from Bendix or its workers' compensation insurer, $14,109.24 of which was for medical expenses, $52,436.66 of which represented lost wages, and $1,952.90 of which was not explained (Lien Statement; Def's. Memorandum Exhibit 7).

American Overseas has moved for partial summary judgment seeking a determination that it is entitled to a credit against any recovery by Yost in this action in the full amount ($68,948.60) of the payments Bendix made to Yost. The motion is based on the premise that Yost was a seaman. American Overseas argues that therefore Yost had a claim for negligence against his employer, Bendix, under the Jones Act (46 U.S.C.App. § 688 et seq.); that Bendix had no obligation to pay Yost under the Florida workers' compensation statute; that accordingly Bendix was a volunteer and cannot, as a matter of law, recover from Yost the amount paid to him as workers' compensation; and that Yost will have a double recovery unless American Overseas is accorded a credit in the amount of the payments made by Bendix. Yost's position is that the payments made by Bendix to Yost are from a collateral source and hence may not be the subject of a credit.

## THE SEAMAN STATUS ISSUE

■ The threshold issue raised by the motion for partial summary judgment is whether Yost was a seaman within the meaning of the Jones Act. Under that statute, a seaman is entitled to maintain an action for negligence against his employer and, in that action, the seaman is entitled to the same rights and remedies afforded railway employees under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 et seq. 46 U.S.C.App. § 688. For some years, the definition of the word "seaman" has been the subject of disagreement among the circuits. However, that issue was settled in *McDermott Int'l., Inc. v. Wilander*, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991), wherein the Supreme Court of the United States traced a line of its decisions on the issue; explained what it perceived to be the reasons for the disagreement spawned by its earlier decisions; and outlined in clear terms the test to be followed in deciding henceforth whether a maritime employee is or is not a "seaman." The Supreme Court preceded its articulation of the test by explaining that:

> All who work at sea in the service of a ship face those particular perils to which the protection of maritime law, statutory as well as decisional, is directed.

*Id.* at ——, 111 S.Ct. at 817. The Supreme Court then instructed:

> The key to seaman status is employment-related connection to a vessel in navigation. We ... hold that a necessary element of the connection is that a seaman *perform the work of a vessel.* ... In this regard, we believe that the requirement that an *employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission'* captures well an important requirement of seaman status. It is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel, but *a seaman must be doing the ship's work.*

*Id.* (emphasis added; citations omitted). The Supreme Court also held that the determination of seaman status is a mixed question of law and fact which may be resolved on summary judgment, notwithstanding the need for a fact-specific inquiry respecting "the nature of the vessel and the employee's precise relation to it." *Id.* at ——, 111 S.Ct. at 818.

The facts establishing the nature of the Vessel or Yost's precise relation to it are not in dispute. The Vessel's sole purpose was to transport weaponry and equipment

of the Marine Corps to locations specified by the government to be available for use in the event of military emergency. Yost's job was to maintain and keep in good repair the ordnance and equipment of the Marine Corps. Yost was on the Vessel twenty-four hours a day. He contracted on for shipboard duty for a year. He was on the Vessel on the high seas in international waters enroute to a destination directed by the Department of Defense when he was injured.

Applying the *Wilander* test to the undisputed facts, there is but one conclusion to be reached by reasonable persons: Yost was a seaman within the meaning of the Jones Act. Yost was a sea-based maritime worker whose allegiance was owed to the Vessel. His duties were central to the function of the Vessel and to the accomplishment of its mission. He was without doubt "doing the ship's work" within the meaning of the test set forth by the Supreme Court in *Wilander.*

This finding is underscored by the fact that Yost's papers opposing summary judgment do not contest the position of American Overseas that Yost is a seaman under the *Wilander* test. The only mention of seaman status is in a footnote of Yost's brief opposing summary judgment and even that does not meet the showing made by American Overseas on the issue of seaman status.[1]

To avoid summary judgment on this point, Yost must identify "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis in original). This obligates Yost to point to genuine issues and

it also means that the dispute must be as to facts which are material to the resolution of those issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The plaintiff must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356.[2] It is now settled that bare allegations of the counsel in briefs or argument do not satisfy this standard because they "fail to meet the evidentiary standard necessary to create a genuine issue of material fact." *Rountree v. Fairfax County School Board,* 933 F.2d 219, 223 (4th Cir. 1991).[3]

For the foregoing reasons, the Court holds that, Yost was a seaman under the Jones Act.

## THE CREDIT ISSUE

American Overseas contends that it is entitled to have credited against any damages Yost might recover on his seaworthiness or negligence claims against American Overseas the amount of payments ($68,-948.60) Bendix unilaterally and voluntarily paid to Yost purportedly pursuant to the Florida Workers' Compensation statute.

The Florida Workers' Compensation statute provides that: "[n]o compensation shall be payable in respect of the disability or death of an employee covered by the Federal Employer's Liability Act, the Longshoremen's and Harbor Worker's Compensation Act or the Jones Act." Fla.Stat. § 440.-09(2). Yost says that he did not apply for workers' compensation and that Bendix unilaterally initiated the payments. Nothing in the record explains why Bendix paid Yost compensation when, under the Florida

---

1. The finding that Yost is a seaman is further supported by the Complaint. There Yost asserts a claim for breach of the warranty of seaworthiness. Only a seaman is entitled to assert that cause of action for personal injury. Thomas J. Schoenbaum, *Admiralty and Maritime Law* 134 (1987).

2. *See also Lujan v. National Wildlife Federation,* 497 U.S. 871, ——, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *Davis v. Thoman Motel Corp.,* 900 F.2d 28, 31 (4th Cir.1990) (Powell, J.).

3. *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990) (The plaintiffs "may not rest upon mere allegation or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial."); *Miller v. Federal Deposit Insurance Corp.,* 906 F.2d 972, 973–74 (4th Cir. 1990).

statute, it was not required to do so. However, Bendix and its workers' compensation insurer have notified American Overseas that they claim a lien under the Florida statute against any recovery in this action. (Sherman Declaration Exhibit C, Def's. Memorandum Exhibit 1).

Yost opposes the motion for partial summary judgment by arguing that the payments made by Bendix fall under the "collateral source" rule and hence may not be made the subject of a credit against any recovery he secures against American Overseas in this action.

Resolution of these conflicting contentions necessitates resort to familiar and generally accepted principles of tort law because the dispute over treatment of these payments arises between joint tortfeasors. According to Yost, he was injured because the ice machine was not properly maintained and therefore leaked water onto the floor of the crew's mess where it was allowed to stand and was not properly removed. Yost says that this conduct constitutes negligence and a breach of the warranty of seaworthiness. Yost also says that everyone on the ship knew of the conditions which he contends were both tortious in nature and the cause of his injuries. On this record, that would include the Bendix supervisors who, according to Yost, were exposed daily to those conditions.

■ Bendix, as Yost's employer, owed him a duty to use reasonable care to provide him a safe place to work; to inspect the Vessel for hazards; and to take reasonable precautions to protect Yost from clearly observable defective conditions. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329 (5th Cir.1977).[4] In *Davis,* the Court of Appeals held that the employer's failure to inspect and discover a visibly slippery deck of a vessel not owned by plaintiff's employer could constitute actionable negligence by plaintiff's employer sufficient to warrant recovery from the employer in a Jones Act action. *See also, Martin v. Walk, Haydel & Assoc.,* 742 F.2d 246, 249 (5th Cir.1984). On this record, Yost could have instituted

an action in negligence against Bendix for breach of the duty found to have existed in *Davis.*

■ Furthermore, it is the general rule that:

Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.

*Restatement (Second) of Torts* § 875. It is also generally accepted that:

A release or covenant not to sue given to one tortfeasor does not release the other unless it so provides, but *payments made by one of the tortfeasors reduce the amount payable by others.*

*Restatement (Second) of Torts* § 875 Comment d, at 315 (emphasis added). See also, *Restatement (Second) of Torts* § 879. Where tortfeasors are jointly liable for the entire harm, the injured person may bring an action against one or both of them and recover judgment against one or both for the full amount of the harm but, of course, double recovery may not be had. *Restatement (Second) of Torts* § 879 Comment b, at 325.

■ Where tortfeasors are jointly liable for the entire harm, a payment by one of them made in compensation of the harm diminishes the claim against all tortfeasors to the extent of the payment and this is true:

... whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment.

*Restatement (Second) of Torts* § 885.

■ These principles have given rise to the generally accepted rule that:

(1) A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is *credited against his tort liability, as are payments made by another who is,* or believes he is, *subject to the same tort liability.*

---

**4.** This duty is not in derogation or diminution of the duties owed Yost by American Overseas.

*Restatement (Second) of Torts* § 920A(1) (emphasis added). In explaining the term "by a person acting for him" used in § 920A(1), Comment a to the Restatement provides:

> *Payments by or for defendant.* If a tort defendant makes a payment toward his total liability, it of course has the effect of reducing that liability.... This is true also of a payment by another tortfeasor of an amount for which he is liable jointly with the defendant or even by one who is not actually liable to the plaintiff if he is seeking to extinguish or reduce the obligation. (See § 885).

*Restatement (Second) of Torts* § 920A Comment a, at 513–514.

■ On the other hand, under the collateral source rule a payment from a source independent of, or unrelated to, the tortfeasor does not reduce his liability to the injured party even if the result is to afford the injured party double compensation.[5] This is because, as a policy matter, the law allows the injured party, rather than the tortfeasor, the windfall created by a collateral source payment *Restatement (Second) of Torts* § 920A Comment b, at 514. In general, "[t]he law does not differentiate between the nature or the [collateral source] benefits, so long as they did not come from the defendant or a person acting for him." *Id.* As we have seen, "a person acting for him" includes another tortfeasor.

■ Hence, if Bendix is a joint tortfeasor, a payment by Bendix to Yost would diminish the liability of American Overseas and would be the subject of a credit. The record here is clear that the liability, if any, of Bendix, as respects Yost, would be joint with American Overseas because their conduct jointly contributed to cause Yost's injury.[6] There is no requirement that there be an adjudication or determination of liability before the rule of § 920A(1) becomes applicable.[7]

■ What is determinative on this record is whether, as a matter of law, Bendix can be considered a joint tortfeasor with American Overseas as to Yost's claimed injuries. On the record made by Yost, he could have sued Bendix and colorably alleged that the Bendix supervisors either did not inspect the premises where Yost was injured on May 9, 1989 or that they inspected it and failed to see the standing water or that they did not remedy conditions of which Yost says they were aware and which, when if left uncorrected, were a reasonably foreseeable source of danger to Yost. On this record then, Bendix must be considered a joint tortfeasor. Indeed, if Yost had filed an action against Bendix under the Jones Act, it would have been entitled to have a judgment against it reduced by the amount of the payments it made to Yost unless they were collateral source payments. *Restatement (Second) of Torts,* § 920A(1). As between Yost and Bendix, the payments made by Bendix would not have been collateral source payments because they were not in fact owed as workers' compensation under the Florida statute. For the foregoing reasons, it appears that American Overseas should be accorded the benefit of the credit which it seeks.

This result is consistent with the concepts of credits which run throughout the fabric of admiralty and maritime jurisprudence. Under that body of law, Congress and the courts have established reasonably

---

5. Section 920A(2) states the collateral source rule: "Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or part of the harm for which the tortfeasor is liable."

6. It does not matter, as may have been the case, that Bendix may have been entitled to indemnity from American Overseas under the passive-active negligence doctrine because the issue here is what was their status as respects Yost and the injury he alleges. The rights, if any, of Bendix against American Overseas are not before the Court and, in any event, the statute of limitations has run on Yost's claim against Bendix under the Jones Act.

7. The rule of § 920A(1) would apply by its terms absent a determination of joint tortfeasor status if Bendix sought "to extinguish or reduce its obligation" in making the payments to Yost. That, of course, could not be reached on summary judgment on this record because there is no evidence of what Bendix sought to accomplish in making the payment.

relaxed rules and remedies permitting injured seaman to be compensated by their employers, shipowners, and ship operators for personal injuries sustained in their employment on or around the seas. As evidenced most recently in *Southwest Marine, Inc. v. Gizoni,* —— U.S. ——, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991), the courts also have been liberal in allowing pursuit of those remedies concurrently and consecutively even when they ultimately may be mutually exclusive. However, the same body of law generally precludes double recovery by allowing credits and offsets. *See, e.g., Gizoni,* —— U.S. at —— – ——, 112 S.Ct. at 493–94. *Kirk v. Allegheny Towing,* 620 F.Supp. 458, 462 (W.D.Pa.1985) (citing *Inter alia, Sun Ship, Inc. v. Pennsylvania,* 447 U.S. 715, 722–24, 100 S.Ct. 2432, 2437–38, 65 L.Ed.2d 458 (1979)), *Phillips v. Western Co. of North America,* 953 F.2d 923, 929 (5th Cir.1992), *Biggs v. Norfolk Dredging Co.,* 360 F.2d 360, 364 (4th Cir.1966).

The approach traditionally taken to determine the propriety of credits for medical benefits and other losses under claims for maintenance and cure are instructive, *albeit* not determinative, here. At the risk of oversimplification, the synthesized rule appears to be that when a seaman is entitled to maintenance and cure under maritime law and benefits are paid to compensate for his or her injuries, a credit or set-off will not be allowed when the payments are from a source such as an insurance policy which is part of an employment contract, or required by a collective bargaining agreement or where the coverage is paid by the seaman himself; but, when the shipowner has purchased insurance or set up a fund with an eye toward indemnity from liability, the set-off will be allowed. *Gauthier v. Crosby Marine Service, Inc.,* 752 F.2d 1085, 1090 (5th Cir.1985) (No set-off allowed where seaman alone has purchased insurance.), *Owens v. Conticarriers & Terminals,* 591 F.Supp. 777, 792–794 (W.D.Tenn.1984) (No set-off if medical insurance is provided as a "fringe benefit."), *Gosnell v. Sea–Land Service, Inc.,* 782 F.2d 464, 468 (4th Cir.1986) (Seaman not entitled to maintenance and cure award when paid for by union's medical plan at no

expense to him.), *Al–Zawkari v. American Steamship Co.,* 871 F.2d 585, 589 (6th Cir. 1989) ("Double liability" against ship owner not permitted where it provides for an exclusively funded medical plan to indemnify its absolute liability.), *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 532–533 (9th Cir.1962) (Double recovery not allowed for same items of damage award in Jones Act claim of negligence.), *Miron v. All Alaskan Seafoods, Inc.,* 705 F.Supp. 518, 519 (W.D.Wash.1988) (Double recovery of seaman not allowed for amounts paid by Alaska Workers' Compensation Act for medical expenses and lost wages under Jones Act.), *Shaw v. Ohio River Co.,* 526 F.2d 193, 201 (3rd Cir.1975) (Vessel owner has no obligation to provide maintenance and cure if it is furnished by others at no expense to the seaman.) *See generally, Haughton v. Blackships, Inc.,* 462 F.2d 788 (5th Cir.1972).

These decisions comport with the comment to the Restatement 920A which, in explaining the collateral source rule, also look at the source of the payment which is alleged to diminish the liability of a joint tortfeasor. The comment makes clear that:

> [i]f the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits *so long as they did not come from the benefits or a person acting for him.*

*Restatement (Second) Torts* 920A, Comment b (emphasis added).

This, however, does not alter the equally important principles discussed fully above which culminate in the rule that:

> A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the

payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment.

*Restatement (Second) of Torts,* § 885(3).

The propriety of granting a credit here for a payment made by a joint tortfeasor is further supported by the now settled procedures by which the courts routinely adjust damages in admiralty cases to prevent double recovery when an injured seaman proves liability on more than one theory. Thomas J. Schoenbaum, *Admiralty and Maritime Law* 161 (1987). *See Gypsum Carrier v. Handelsman,* 307 F.2d 525 (9th Cir.1962), *Constructores Tecnicos v. Sea–Land Service,* 945 F.2d 841 (5th Cir.1991). Thus, as in the general approach followed by the Restatement, it would appear appropriate to adjust any damages awarded to Yost by the jury in this action by according American Overseas a credit to the extent of the payments already received by Yost from Bendix.

■ At oral argument, counsel for Yost suggested that Yost might have a claim against American Overseas under the LHWCA, as amended by the Defense Base Act. The LHWCA creates rights against employers, not shipowners or ship operators. 33 U.S.C. § 904(a). The Defense Base Act does not change that fundamental part of the LHWCA. Yost's brief cites no authority to the contrary. Indeed, the only argument in that brief which addresses a claim under the LHWCA cuts against the suggestion made during oral argument. The Court has found no authority to support the notion that the LHWCA provides the basis for a claim against American Overseas. In any event, there is no relation between that argument and the issue presented by the motion for partial summary judgment.

Yost argues that, if a credit is accorded, he will be subject to a double diminution of his damages because he will have to repay Bendix the payments it made purportedly under the Florida Workers' Compensation statute. That is a reasonable, but ill-founded, concern.

■ Giving Bendix the benefit of the doubt, it apparently paid Yost under the mistaken belief that the payments were required by the Florida Workers' Compensation statute. This would not permit Bendix to obtain restitution from Yost because:

It is settled at law, and the rule has been followed in equity, that money paid under a mistake of law with respect to the liability to make payment, but with full knowledge, or with means of obtaining knowledge, of all the circumstances, cannot be recovered back.

3 J. Pomeroy, *A Treatise on Equity Jurisprudence* § 851, at 319 (5th ed. Symons 1941); 66 Am.Jur.2d *Restitution & Implied Contracts* §§ 138–40 (1973 & Supp. 1992). The Restatement of Restitution makes clear that:

Except as otherwise stated in §§ 46–55, a person who, induced thereto solely by a mistake of law, has conferred a benefit upon another to satisfy in whole or in part an honest claim of the other to the performance given, is not entitled to restitution.

*Restatement of Restitution* § 45; *see also* D. Dobbs, *Remedies* § 11.8, at 760 (1973) ("benefits conferred under a mistake of law, as distinct from fact, may not be recovered").

There are several exceptions to the general rule. *See Restatement of Restitution* §§ 46–55. However, none of them applies to mistaken payment of benefits under a workers' compensation policy. Indeed, as American Overseas points out:

the common law distinction between mistakes of law and mistakes of fact was first introduced in 1802 when Lord Ellenborough refused restitution to an underwriter who paid its insurer because of its mistaken belief that it did not have a legal defense. *Bilbie v. Lumley,* 2 East 469 (1802). Stating that 'every man must be taken to be cognizant of the law,' the court established the principle that mistake of law is not a basis for restitution. *Id.*

American Overseas Reply Memorandum at 3. *See also Kirk v. Allegheny Towing,*

**322**

*Inc.*, 620 F.Supp. 458, 461 (W.D.Pa.1985) (mistaken payments made under LHWCA).

Today, it is not at all unusual that insurance companies making payments under a mistake of law are refused restitution. *See e.g., Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 620 (1st Cir.1988); *The Hartford v. Doubler*, 105 Ill.App.3d 999, 61 Ill.Dec. 592, 594, 434 N.E.2d 1189, 1191 (1982) (insurer is not entitled to restitution for mistaken payments); *Farmers Ins. Co. v. Ownby*, 40 Or.App. 15, 594 P.2d 834, 837 (1979) (payment based on insurer's legal mistake regarding applicability of worker's compensation statute is not recoverable in restitution); *State Farm Mutual Automobile Ins. Co. v. Stokos*, 65 Misc.2d 316, 317 N.Y.S.2d 706 (1970); *Forsthove v. Hardware Dealers Mutual Fire Ins. Co.*, 416 S.W.2d 208, 221 (Mo.App.1967) (insurer making payments under mistaken interpretation of its policy cannot recover restitution); *National Fire Ins. Co. of Hartford v. Butler*, 260 Iowa 1159, 152 N.W.2d 271, 275 (1967); *Waters v. State*, 220 Md. 337, 152 A.2d 811, 823 (1959) (insurance fund erroneously paying unemployment benefits not entitled to restitution); *Virginia Ins. Rating Bureau v. State Farm Mutual Auto Ins. Co.*, 186 Va. 270, 42 S.E.2d 419 (1947).

Here, the payment of compensation benefits by Bendix under the Florida Workers' Compensation statute, if not deliberately made to reduce its possible liability, was made apparently under a mistake of law. *See, e.g., The Hartford*, 61 Ill.Dec. at 594, 434 N.E.2d at 1191; *A Treatise on Equity Jurisprudence* § 841.

For the foregoing reasons, Yost's apprehensions about a double diminution should not operate to preclude the credit to which American Overseas otherwise would be entitled. However, Bendix is not before the Court and, as this action presently stands, the Court cannot assure that Yost will not have to defend against a claim of restitution by Bendix or its insurer or, notwithstanding the view of the law of restitution set forth above, that Yost would prevail in such a suit seeking restitution. According-

ly, the Court will afford Bendix and its insurer the right to intervene here to protect any interests they perceive to be implicated by the decision. To that end, counsel for American Overseas will be required forthwith to provide Bendix and its insurer with copies of the pleadings and discovery in this action and with a copy of this opinion. The Court will set a time certain for Bendix and its insurer to intervene, if they elect to do so. Bendix and its insurer will be permitted an opportunity to brief the seaman status issue and the credit issue if they elect to intervene. A new trial date will be set, if necessary. If Bendix and its insurer do not intervene, familiar principles of estoppel should preclude them from seeking or recovering restitution from Yost.